**BOSTON & MAINE RAILROAD et al.**
**v.**
**UNITED STATES of America and Interstate Commerce Commission et al.**

**Civ. A. No. 56–1004.**

United States District Court
D. Massachusetts.

April 28, 1958.

McCarthy, D. J., dissented.

Lawrence R. Cohen, Herbert Alpert, Boston, Mass., Carl E. Newton, Granville Whittlesey, William T. Griffin, New York City, James W. Grady, New Haven, Conn., Richard Jackson, Boston, Mass., William J. Hickey, Washington, D. C., William A. Colton, Otto M. Buerger, Richard Swan Buell and Joseph P. Hawryluk, New York City, for plaintiffs.

Robert W. Ginnane, Gen. Counsel, and Isaac K. Hay, Asst. Gen. Counsel, I. C. C., Washington, D. C., Victor R. Hansen, Asst. Atty. Gen., James E. Kilday and James H. Durkin, Attys., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., George H. Lewald, Asst. U. S. Atty., Boston, Mass., S. R. Brittingham,

Jr., Chicago, Ill., and Richard J. Ferriter, Boston, Mass., for defendants.

———◆———

Before WOODBURY, Circuit Judge, and WYZANSKI and McCARTHY, District Judges, by designation of Chief Judge MAGRUDER pursuant to Title 28 U.S.C. § 2284.

WOODBURY, Circuit Judge.

This is a controversy, in the main between the long-haul trunk line railroads and the short-haul terminal railroads, over the price a railroad ought to pay for the use on its lines of freight cars owned by another railroad.

The question of car hire is not novel. To understand its present aspects a little history will prove helpful.

In the early days of railroading in this country no railroad allowed its freight cars to leave its rails. Through freight to be transported over more than one line was unloaded and reloaded at junction points. With the development of more efficient transportation methods following the Civil War this wasteful and time-consuming practice of transferring cargo was gradually abandoned and for a charge the railroads began to permit their loaded cars to move off their tracks onto the tracks of connecting carriers.[1] At first the compensation to the car-owning road was fixed by the railroads on the basis of the mileage travelled by the cars of one road over the tracks of another. This basis for compensation, however, proved unsatisfactory largely for two reasons; the car-owning road had no means of verifying the mileage travelled by each of its cars over other lines and it provided no incentive to the using road for the prompt handling and early return of cars to their owners.[2]

As a solution the American Railway Association about the turn of the century, after years of study and investigation, established as the basis for compensation a flat sum per day for car use, regardless of the type or age of the car involved or the distance it travelled over the user's line. The *per diem* rate for use, known simply as the *per diem*, was gradually increased by the railroads over the years until it reached a point in the early 1950's at which the short-haul, terminating, and predominantly car-using railroads rebelled. This brings us to the present controversy and its background.

Except for one abortive attempt by the Interstate Commerce Commission, see Palmer v. United States, D.C.1947, 75 F.Supp. 63, the *per diem* rate has always been set by the railroads themselves acting in recent years through their organization, the Association of American Railroads, known as the AAR. An agreement, known as Agreement No. 7, was drafted by the AAR setting up the procedures to be followed by it in fixing *per diem* rates and this agreement was signed by a majority of the railroads.[3] Acting according to the procedures outlined in the agreement, *per diem* rates were fixed at $1.50 as of September 1, 1947; $1.75 as of November 1, 1949; $2 as of May 1, 1952; and $2.40 as of August 1, 1953.

At first the railroads generally, signers and non-signers of the agreement alike, settled with one another at the rates established thereunder. In March, 1951, however, the New York, Susquehanna & Western Railroad (Susquehanna hereinafter), which was not a party to the agreement, served notice that after April 1 it would no longer pay the $1.75 rate then in effect, but offered to settle its *per diem* debit balances thereafter on a graduated scale ranging from $1.20 to $2 depending on the age of the cars it used. It later offered to increase its scale to a range of from $1.33 to $2.21 but its offers were not accepted and in consequence it became embroiled in a

---

1. In 1911 car interchange was made obligatory.

2. For a more detailed history see Chicago, R. I. & P. Ry. Co. v. United States, 1931, 284 U.S. 80, 90 et seq. and Stone, J., dissenting, at page 101 et seq., 52 S. Ct. 87, 90, at page 94, 76 L.Ed. 177.

3. The Agreement provided for rights of withdrawal and independent action by the signatory railroads, and the Commission, acting under § 5a(2) of the Act (62 Stat. 472), 49 U.S.C.A. § 5b(2), approved it as in compliance with § 5a (6) and therefore valid in spite of the Anti-Trust Laws, 15 U.S.C.A. §§ 1–7, 15 note, 12 et seq. Association of American Railroads—Agreement, 277 ICC 413. Reopened and reconsidered Ahnapee & W. R. Co. v. Akron & B. R. R. Co., ICC Docket No. 31774, decided March 7, 1957.

number of law suits. In June, 1953, the Boston & Maine Railroad and the New York, New Haven and Hartford Railroad Company withdrew from the agreement and gave notice of their refusal to pay the $2.40 rate and also even the earlier $2 rate after July 31, 1954, the Boston & Maine offering to pay on either a graduated basis or at a flat rate of $1.72 per day. Several other railroads took similar courses and the present proceeding ensued.

It started with a complaint filed with the Interstate Commerce Commission by 19 of the larger class I railroads, against five other class I railroads, all of them short-haul roads like the Boston & Maine, the New Haven, and the Susquehanna, and six short-line roads in classes II and III, such as the Barre and Chelsea, the St. Johnsbury & Lamoeille County and the New Jersey and New York Railway Company (Horace Banta, Trustee). Fifteen class I railroads intervened on behalf of the complainants and fifty-six railroads, for the most part in classes II and III, intervened on behalf of the respondents.

The complainants disclaimed any intention to invoke the specific power conferred on the Commission by § 1(14) (a) of the Act which authorizes it to "establish reasonable rules, regulations, and practices with respect * * * to the compensation to be paid for the use of any * * * car * * * not owned by the carrier using it. * * * *." Instead, alleging that charges less than those fixed under Agreement No. 7 would be unjust, unreasonable and non-compensatory, and that the respondents' actions in offering to pay at other than the uniform *per diem* rate established therein, had been, were and would be disruptive of the "uniform national basis" for handling *per diem* which the Commission had deemed necessary in the public interest, the complainants asked that:

> "the Commission find and declare that the per diem rates of $1.75 and $2, during the periods in which these rates were effective, were just, reasonable, and otherwise lawful, that the current per diem rate of $2.40, effective August 1, 1953, is

just, reasonable and otherwise lawful, and that the performance of orderly transportation service by railroad in the public interest requires uniform observance of such rates by defendants together with other carriers; and that the Commission grant such other and further relief as may be required in the premises."

The defendants answered, in general challenging the *per diem* rates established under the agreement as excessive and asserting that their offers of settlement were fair, just, reasonable and compensatory. In addition some of them challenged the jurisdiction of the Commission to entertain the complaint. The matter came on for hearing before a trial examiner and he, upon full presentation, filed a proposed report wherein after considering the evidence and arguments in detail he concluded that "The Commission should find and declare that the *per diem* charges of $1.75 and $2.00 were reasonable during the periods in which they were effective and that a reasonable charge for present use would be $2.10." He accordingly recommended the entry of a declaratory order to that effect.

On exceptions the full Commission reached conclusions differing in part from those reached by the trial examiner. It found on its analysis of the evidence and the arguments that the *per diem* rates as fixed in the agreement were fair and reasonable. It said that "on the basis of the facts and circumstances before us" the *per diem* charges specified in the agreement were such as "could properly be established under section 1 (14) (a)" of the Act and that: "It necessarily follows that lower charges in our judgment would not be compensatory, either at present or in the past. Wherefore, it said: "We find and declare that the *per diem* charges of $1.75, $2.00, and $2.40 were not in excess of reasonable compensation during the periods in which they were effective, and that the latter charge is not in excess of reasonable compensation for present use," and it entered an order discontinuing the proceeding.[4] Chicago, Burlington & Quincy Railroad Co. v. New York, Susquehanna

4. We have little doubt that the Commission's order is subject to judicial review under the rule of Frozen Food Express v. United States, 1956, 351 U.S. 40, 76

S.Ct. 569, 100 L.Ed. 730, for the practical impact of the order is to require the respondent carriers, and, indeed, as a practical matter all others, to pay the charges

& Western Railroad Co., 297 ICC 291 (1955), reconsideration and rehearing etc. denied, July 16, 1956.

At the outset of our consideration of this action brought by a number of terminal short-haul railroads under Title 28 U.S.C. § 1336 to enjoin, set aside and annul the above order of the Interstate Commerce Commission, we are faced with the question of its jurisdiction. The assertion is, broadly stated, that the only jurisdiction conferred by Congress on the Commission in the premises is that embodied in § 1(14) (a) giving it power to "establish reasonable rules, regulations, and practices with respect to car service * * * including the compensation to be paid" by one railroad for the use of the cars of another, and that, since this jurisdiction was neither invoked nor exercised, it must follow that the Commission does not have authority to enter a declaratory order as to past or even present rates. We do not agree.

▮ Section 5(d) of the Administrative Procedure Act, 60 Stat. 239, 5 U. S.C. § 1004(d) provides that within its jurisdiction any agency "is authorized in its sound discretion, with like effect as in the case of other orders, to issue a declaratory order to terminate a controversy or remove uncertainty." There can be no doubt that the railroads involved are subject to the jurisdiction of the Commission, nor can there be any doubt that a "controversy" exists between them with respect to car-hire. The question is whether the subject matter of their controversy is within the jurisdiction of the Commission. We think that it is.

Certainly the Commission could if it chose, after notice, embark under § 1(14) (a) of the Act upon a full scale investigation and as a result establish by reasonable rules or regulations future practices with respect to car service, including the compensation to be paid by one railroad for the use of freight cars owned by another railroad. But it was not asked to do this and it has disclaimed any intention to do so.

Section 1(14)(a), however, is not the only section of the Act conferring regulatory powers on the Commission with respect to the use by one railroad of another's cars. Section 1(10) defines "car service" to include the "use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property * * * by any carrier by railroad subject to this chapter," and subsection (11) provides:

"It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable, rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful."

In addition to the criminal sanctions imposed by § 10 of the Act, § 8 provides that in the event that any common carrier by railroad subject to the Act shall do, or cause or permit to be done, any act, matter or thing "prohibited or declared to be unlawful" it "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation," together with a reasonable counsel fee. And § 9, gives persons claiming damages under § 8 the election of proceeding in a court of competent jurisdiction or else making a "complaint to the commission as hereinafter provided." Section 13(1) of the Act provides for the filing with the Commission of complaints against carriers for violations of the Act and § 16(1) provides:

"If, after hearing on a complaint made as provided in section 13 of this title, the commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter for a violation thereof, the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named."

It is true that compensation for the use of cars is not specifically included in the definition of "car service" in subsection 10, whereas § 1(14) (a) in giving the Commission power to "establish reasonable rules, regulations, and practices

for car-use found to be reasonably compensatory at the risk of the imposition of

sanctions for violating § 1(11) of the Act to be considered presently.

with respect to car service" goes on to state "including the compensation to be paid \* \* \* for the use of any \* \* \* car, or other vehicle not owned by the carrier using it \* \* \*." It is asserted that the provisions being in some respects *in pari materia* the specific inclusion of compensation for use in § 1(14)(a) indicates clearly that the omission of any mention of compensation in defining car service in subsection 10 could not have been inadvertent with the result that Congress must have intended in subsection 11 to impose no duty on the railroads to establish, observe and enforce just and reasonable *per diem* charges. We do not find the argument persuasive.

■ Car service is broadly defined in subsection 10 to include the "use" and "interchange" of cars, and historically and also very naturally, compensation has always been incidental to and an integral part of the "interchange" of cars between railroads and the "use" of the cars of one railroad by another. Moreover, to construe compensation as outside the ambit of the meaning of "use" or "interchange" as used in subsection (10) would leave the railroads free to make whatever "unjust" or "unreasonable" rules, regulations or practices they might choose with respect to compensation for car use without running afoul of subsection (11). It is hard for us to assume that Congress could have intended any such thing. On the contrary, we think it far more likely that Congress intended to give a right of action for damages to any one suffering loss from an excessive rate of hire for the use of cars.

Our conclusion therefore is that § 1 (11) reasonably construed imposes a duty upon the railroads to charge no more than reasonable compensation for the use of their cars by other railroads, that § 13(1) empowers the Commission to entertain complaints alleging excessive charges for car hire, and that § 16 gives the Commission authority to enter orders awarding damages to those harmed by excessive car hire charges. Thus, since the Commission has jurisdiction to enter an order awarding damages for past or present unreasonable charges for car hire, it has jurisdiction under § 5(d) of the Administrative Procedure Act in its discretion to enter a declaratory order with respect to the reasonableness of such charges.

We turn now to the merits.

The trunk line long-haul railroads, serving as they do the relatively sparsely settled and perdominantly producing areas of the country, originate more traffic than they terminate. The short-haul railroads serving the coastal ports and the relatively more heavily populated and predominantly manufacturing areas, on the contrary, terminate more traffic than they originate. Thus, since a railroad must provide cars enough to handle the freight originating on its lines, the freight car equipment of the country is for the most part owned by the trunk line railroads and that owned by the short-haul lines is almost a negligible proportion of the whole. See Chicago, R. I. & P. R. Co. v. United States, 1931, 284 U.S. 80, 93, 95, 52 S.Ct. 87, 76 L.Ed. 177. This situation does not exist because of default by the short lines. Having more cars coming in from other lines to unload than they have cars to load and send back, they naturally, to avoid back hauling empty cars, prefer to load and return foreign cars instead of loading their own cars for dispatch off their lines. And this practice has the sanction of Car Service Rule 1, see Car Service, Freight Cars, 268 I.C.C. 687, which provides:

"Home cars shall not be used for movement of traffic beyond the limits of the home road when the use of other suitable cars under these rules is practicable."

From the fact that railroads first load off-line freight on available foreign line cars, it is obvious that if a short-line predominantly freight-terminating road owns many cars it will have a surplus which must perforce remain wastefully idle on its sidings awaiting an overflow of traffic, if any. Thus the trunk lines, as owners, for the most part furnish the freight car equipment used by the short lines and the short line traffic-terminating roads are perforce *per diem* debit roads, interested in a low *per diem* rate, whereas the long-haul predominantly traffic-originating roads are *per diem* credit roads interested in a high *per diem* rate. The present controversy stems from this conflict of interest.

The short line roads contend that under Agreement 7 mentioned above the trunk lines through their voting power (under the agreement *per diem* rate increases are authorized by vote of the signatory railroads, each road casting one vote for each freight car that it owns) have raised the *per diem* rate to a more than compensatory level, and they charge the Commission with error in putting its stamp of approval on the rate increases established under the agreement.

■ There is not and cannot be any question that every railroad is entitled to be paid fair and just compensation for the use of its freight cars by another road. Nor can there be any question that from the car owner's point of view *per diem* is by and large and on the whole a fair enough method for calculating the compensation to which it is entitled. The question is whether *per diem,* which takes account only of the time factor and leaves out altogether the use factor, that is distance travelled on the user's line, is a fair method of determining compensation from the car user's point of view. And, if this question be answered in the affirmative and *per diem* be approved as the fairest practical method for calculating compensation from both points of view, the question then arises whether the Commission erred in its calculation of the fair *per diem* rate. We shall consider the question last stated first.

■ It has long been generally recognized that car hire, however established, should be enough reasonably to compensate the car owner for its costs of ownership and no more, and with this in mind that the *per diem* charge should be enough, but no more than enough, to cover the cost to the car owner of 1) repairs, 2) taxes, 3) depreciation, 4) interest or investment, and 5) miscellaneous expenses of ownership. Obviously therefore the determination of the *per diem* rate poses a complicated question of railroad cost accounting committed by law to the Commission as a matter peculiarly within its expert competence. We therefore approach our analysis of the Commission's computations with due deference.

Detailed analysis of the Commission's computations with respect to each one of the items of car ownership expense listed above is not necessary for present purposes. We shall consider but two of them, repairs and depreciation, and the so-called "car day divisor" by which annual costs of freight car ownership are divided to reach the cost per day.

The item for repairs, the largest single component of the *per diem* charge, was calculated by the Commission largely on the basis of an account required by the Commission to be kept by all railroads known as Account 314, Freight Train Cars—Repairs. This account is of a comprehensive nature including the cost of repairs to cabooses and refrigerator cars not covered by *per diem,* and a number of other costs and expenses not directly related to the use of foreign cars. The Commission made allowances for some of these irrelevant costs included in the account but it rejected the suggestion that the account be broken down by the railroads to reflect more accurately the actual annual cost of maintaining a freight car. Such a break down of the account was recommended by the Subcommittee on Mileage and Per Diem of the AAR, which was charged with the specified duty of fixing *per diem* under Agreement No. 7, but the General Committee of the AAR having final say on *per diem* rejected the recommendation. There was persuasive evidence that a break down of the account was practical, indeed, that some railroads at little accounting cost were already doing so for their own information. Nevertheless the Commission said:

> "The recommendation of the Subcommittee deserves further consideration. However, it is not desirable to delay the decision of this case pending an effort to provide additional data bearing on car repairs."

■ Perhaps it is within the Commission's competence to reject the recommendation in the interest of expedition. But we do think it should not have done so without a more thorough investigation and more detailed findings and analysis. If the recommendation deserved consideration it should have been considered, for there was ample evidence introduced to show the value of a break down of the account in reaching an accurate computation of *per diem* and also to show that such a break down was not impractical.

Depreciation, the second largest element of the *per diem* charge, was calculated by the trial examiner on the basis of the undepreciated ledger value, that is the cost, of the freight car equipment in use which he said was "in accordance with the generally accepted accounting theory." The Commission, however, disagreed. It held that the basis should be "undepreciated reproduction value." We think that this holding is open to very serious question.

The Commission said that it realized that the prevailing accounting practice in determining depreciation was to use ledger value. But it said that it was "not here concerned with the propriety of that practice," because it was engaged in determining the just and reasonable *per diem* rates in effect at the present and during the relevant periods in the past, and in reaching that determination it would be less than realistic if it failed to take into consideration "that carriers who now buy cars must pay prices predicated on present values, and those who rent cars owned by others should expect to pay rentals based on such values."

■ If depreciation is an element, and not a minor one, of the *per diem* charge, we fail to see why accepted accounting practices for determining depreciation should be tossed aside as irrelevant. Moreover, as the trial examiner pointed out, ledger value is a known figure whereas the cost of reproduction can at best only be estimated and the process is inherently difficult because it involves many assumptions which are at least open to question. Furthermore, there is persuasive evidence that with ever faster freight trains and ever more efficient use of cars, present freight car requirements are met with fewer cars than were formerly needed with the result that in all probability many cars now in use will never actually be replaced so that on the Commission's basis car users in paying *per diem* will in part be compensating car owners for expenses they will never incur.

We turn now to the "car day divisor" by which the Commission determined the average cost per day of car ownership.

It appears to be generally agreed that surplus or unserviceable cars should not be included in computing the average daily cost of owning a freight car. The question therefore is to determine the average number of days per year that freight cars are in active use, that is to say, either in active use on the line of the owner, or else on a foreign line, whether in active use thereon, or laid up for repairs, or standing idle. Since no car is in active use all the time an adjustment is necessary to spread the actual annual cost of ownership over the shorter period when the car is in active use. This is accomplished by means of a car-utilization ratio which is, simply, the ratio which the average number of days a freight car is in active use bears to 365, the number of days in the year.

Since all the freight cars in the fleet are not in active use all the time, the utilization ratio is always less than 100 per cent. The effect of the ratio, therefore, is to increase the *per diem* charge over what it would be if all cars were in use all the time and consequently the lower the ratio the higher the *per diem* charge. That is, a ratio of say 75% would lead to a higher *per diem* charge than a ratio of say 90%.

The Commission, to determine the appropriate car utilization ratio for calculating *per diem*, averaged actual car utilization over the past twenty years. This period included several of the depression years of the 1930's when many freight cars lay idle for want of traffic and consequently use of the twenty-year period produced a lower ratio and a higher *per diem*, than would have been the case had a shorter period been used.

■ The plaintiffs argue strenuously and persuasively for the use of a shorter period than twenty years in computing average freight car utilization. We would find it difficult, however, in view of the nature of the question and the Commission's expertness in the field, to say that the Commission committed error of law in using the twenty-year period. But the Commission reached its conclusion in part upon an earlier decision, Alabama, T. & N. R. Co. v. Aberdeen & R. R. Co., 274 I.C.C. 383 (1949), from which it quoted, wherein it had said at page 389: "The evidence is persuasive that an active-car divisor reflecting average age, now approximating 20 years, of freight cars in service, and covering rep-

resentative periods of both heavy and light traffic, would produce more accurate results than a period of 5, 10 or 15 years". We think the Commission erred insofar as it considered car-age a factor in computing car-utilization. We agree with the statement of the trial examiner who said in this connection:

"The mere fact that freight cars have an average life of about 20 years affords little or no ground for assuming that their probable utilization in any given future year will be the same as that for the average of the past 20 years. There is no reason to believe that economic cycles are so marked."

The foregoing discussion is more by way of warning to the Commission for its future guidance than a statement of the grounds for our decision annulling and setting aside the order of the Commission. Basically and fundamentally we ground the result which we reach upon the inadequacy of the Commission's consideration of the first question stated earlier in this opinion.

*Per diem*, as Mr. Justice Stone pointed out in his dissent in Chicago, R. I. & P. Ry. Co. v. United States, 1931, 284 U.S. 80, 112, 52 S.Ct. 87, 98, 76 L.Ed. 177, "is admittedly but a rule of thumb." We are not fully persuaded, however, as Mr. Justice Stone suggested, that it is nonetheless "the best which experience has devised to meet all the complex requirements growing out of the average car-hire situation." The *per diem* method may work out well enough on the average over a period of years to provide the railroads as car owners with fair compensation for the use of their cars. But there is another side to the coin, and that is the fairness of the method to the railroads as car users.

The short-haul, terminating and predominantly freight car-using railroads, by the very nature of their operation, move freight cars relatively short distances over their lines. And, as the Commission pointed out, "The average detention per car in their terminals is high." Thus on these roads, because of their short-haul terminating nature, the average freight car is subjected to relatively little mileage, and, on the other hand, is necessarily detained for unloading, and if traffic permits reloading, for a relatively long period of time in relation to its total mileage movement. On the basis of these considerations, supplemented by evidence that a study conducted in 1948 by the Engineering Section of the Commission's Bureau of Valuation disclosed that 70% of the cost of freight car repairs and 45% of the cost of freight car depreciation are directly attributable to the mileage to which a car is subjected as distinguished from the passage of time alone, the plaintiffs strenuously argue for a method of calculating car-hire which will include a mileage factor in addition to a time factor. They do not suggest going back to the early method of calculating car hire solely on the basis of the mileage travelled by each foreign car on a user's line. Nor do they suggest any sort of pure mileage basis for calculating car-hire, such, for instance, as a rate calculated only on the average mileage travelled by freight cars on a user's line.

Their suggestion is that a fixed mileage factor be determined for each road based upon the average distance in miles which freight cars move per day on its lines, which it is said can easily be determined from statistics kept by the railroads and will need to be revised only when there is a substantial change in a railroad's freight traffic pattern, and that this use factor be used in conjunction with a uniform time factor for all railroads to produce a rate of car-hire fair to all railroads, both short and long-haul.

Basically this time-mileage plan involves a separation of the national aggregate car ownership cost into two categories, one consisting of that proportion of the aggregate cost directly attributable to mileage use and the other consisting of the remainder which is treated as attributable to the passage of time. Thus under the plan the *per diem* car-hire charge for a particular road is a composite figure consisting of the sum of that particular road's mileage component and the uniform national average unit cost per day attributable to time alone. It is said that the function, and the virtue, of this plan is to reallocate the aggregate ownership costs among the

using railroads directly in proportion to the actual use, i. e., the wear and tear, incurred by cars used on each road.

The Commission gave the plan only cursory consideration. After stating its general features it said that the determination of a separate mileage use rate could not be made from the evidence before it in the case, and moreover that "it (such determination) would involve a long and complicated statistical undertaking." [5] It then added: "If by that means a scheme of equitable separate charges for individual user roads could be devised, there would be an increase in the labor now required for settling *per diem* accounts." Following this it briefly discussed a plan proposed by the Boston & Maine Railroad for determining a *per diem* rate based on the average age of the freight car fleet of the car-owning road, a plan no longer advocated which we need not consider, and then it said, referring to both plans:

> "As above indicated, the suggested plans for varying *per diem* charges could not be put into effect without an extensive investigation either by this Commission or by the AAR. The facts and arguments here presented are not persuasive that plans of this kind are desirable."

■ We do not say, for it is not our function to say, that the time-mileage plan proposed is fair and practical and ought to be adopted. What we do say is that the plan deserves more than the cursory consideration given to it by the Commission, for without more detailed findings by it we cannot exercise our judicial function.

It is true that straight *per diem* has been the basis of settlement for freight car use for over fifty years. But that does not render the straight per diem methods sacrosanct. The suggested time-mileage plan on its face seems to have much to recommend it for it combines use with the passage of time as the basis for figuring a rate for car hire, and this certainly seems fairer to the short-haul terminating lines. If the evidence in this case is not sufficient to permit determination of an actual mileage use rate, the Commission can take further evidence or turn the matter over to its accounting staff for investigation and analysis. In advance of a more thorough study we do not see the basis for the Commission's broad conclusion that the plan is both impractical and undesirable. To perform our function in the face of the persuasive evidence that the plan is both desirable and feasible we must have at least some inkling of the basis for the Commission's general conclusions to the contrary. In short we think the Commission erred in brushing aside a matter of such importance to so many vital links in our transportation system with little more than a casual wave of the hand.

■ We are not impressed with the argument advanced by some of the plaintiffs that the Commission should have dismissed the complaint for a declaratory judgment filed with it by the trunk line roads on the ground that in bringing it the complainants were acting in furtherance of a conspiracy unlawful under the Sherman Anti-Trust Act. Indeed, we are so little impressed with the argument that we see no need either to specifically refute it or even to state it in detail.

A decree will be prepared setting aside and annulling the order of the Interstate Commerce Commission.

McCARTHY, District Judge (dissenting).

This action stems from a basic dispute between the short-line, freight terminating railroads and the car-owning freight originating railroads as to the per diem charges for each freight car while it is on the tracks of any railroad but the owner. The problem before the three-judge court concerns the question of the power of the Interstate Commerce Commission to enter the order in ICC Docket No. 31358, and which is presented for review by this court together with the further question of whether or not the order entered was supported by evidence adduced before the Commission.

It is my conclusion that the Commission was without jurisdiction to enter

---

5. There is little or no specific support for this general statement in the record considered as a whole.

the order in question; hence, this separate opinion in addition to the learned discussion written by Judge Woodbury.

As has been stated by Judge Woodbury the Interstate Commerce Commission entered an order which in itself clearly indicated that it was not acting under Section 1(14) (a) of the Interstate Commerce Act. He proceeds, however, and determines that the Commission derives authority elsewhere to enter a declaratory order as to rates. With this determination I cannot agree.

Section 5(d) of the Administrative Procedure Act authorizes declaratory orders of the sort entered here by the Commission, but this section does not confer jurisdiction. Jurisdiction to enter this order must arise elsewhere. Section 9, Administrative Procedure Act, 5 U.S.C.A. § 1008; Olesen v. Stanard, 9 Cir., 227 F.2d 785. Out of deference to the rights of the parties it is the duty of the court to search the Interstate Commerce Act to determine if jurisdiction to enter an order establishing compensation for so-called per diem charges is granted under the Act separate and apart from Section 1(14) (a).

Section 1(4) of the Interstate Commerce Act grants compensation setting power, but this section is limited to through route cases and it is apparent from an examination of the record that the case currently before the three-judge court involves more than "through route" usage and compensation.

Section 1(11) grants rule-making power, but it does not refer to compensation as such. This section is analogous to Section 1(12) which has been interpreted by the Supreme Court in Chicago, Rock Island and Pacific Railway Co. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177, as not including compensation. The language used in that case, 284 U.S. at page 99, 52 S.Ct. at page 93, is conclusive of the entire situation: "That subject (compensation for use of cars), as already appears, is covered by Section 1(14) (a)." This language also negatively answers the suggestion that power to set compensation is impliedly in Section 1(10) or 1(11). Cf. also Palmer v. United States, D.C., 75 F.Supp. 63.

It is my considered judgment that, if the Commission has the power to enter an order such as this, without compliance with the requirements of Section 1(14) (a) the will of Congress has been thwarted. The obvious result of this order of the Commission is to grant to the credit balance roads unlimited power to boost per diem rates. Because of the organization of the Association of American Railroads and the voting procedures used in setting per diem rates, the debit balance railroads, under the order entered by the Commission, are the captives of the credit-balance roads and, because of the "car service" rules and the economic facts of railroad life, they cannot buy enough freight cars to obtain enough votes to control per diem rate setting within the General Committee of the Association of American Railroads.

It may also be noted that the eastern railroads described in this petition have approximately 16,000 freight cars and these roads are all debit car railroads while the large shipping credit car railroads have cars which run into the hundreds of thousands. This becomes important in view of the fact that there is an obligation devolving upon the debit car railroads to use cars owned by the credit car railroads for shipping purposes before they can utilize their own. This is only one view point of the many angles that were thoroughly disregarded by the Interstate Commerce Commission when they disregarded the recommendations of the examiner and accepted "in toto" the rates set by the American Association of Railroads.

Section 1(14) (a) is intended to negative the possibility of the issuance of any order such as we have here—an order which is, in truth, merely a rubber stamp of a decision already made by the stronger of two economic groups. Here, we have an instance of an abandonment of its functions by the Commission altogether in favor of the long-haul trunk line railroads. The Commission in the exercise of its duties has taken the simple way out. Substance has given way to mere form.

Decision that jurisdiction may be found only within the confines of Section 1(14) (a) would obviate the possibility of the Commission surrendering its powers and duties by seeking the easy way.

Congress has spoken only twice as to per diem rates. The first was in Section

1(14) (a) which carries with it the requirement that the Commission conduct an investigation through its impartial experts. The second was in the Bulwinkle Act which authorized the organization of a private association with the approval of the Commission and which excepted rates set by this private association from the sway of the Sherman Anti-Trust Law, but only so long as non-assenters were free to refuse to follow the rates set by the association and to bargain independently. The order before the Court does not set rates in accord with Section 1(14) (a) and the order before the Court does not come within the purview of the Bulwinkle Act, since the effect of the order is to require compliance with the established rates by all railroads, assenters and non-assenters alike.

It should be noted that the Congress has provided for adequate safeguards in each situation. Under Section 1(14) (a) rates may be set only after an impartial investigation conducted by a corps of experts available at all times in the personnel of the Interstate Commerce Commission; under the Bulwinkle Act the non-assenters are free to bargain independently. If the order of the Commission here should be rubber-stamped these safeguards would be lost and the clearest of anti-trust violations by illegal price fixing would be endorsed.

That part of the declaratory order here under review which states that the per diem charges were charges which could have been established under Section 1 (14) (a) and that lower charges would not be compensatory is not an escape hatch which this Court can use for the following reasons.

1. The fact that the charges could have been established under Section 1 (14) (a) is not enough for the Commission to endorse them. Under that section the Commission could not establish rates retroactively.

2. The fact that the Commission finds that lower rates would not be compensatory is not enough, because this finding, if it is such, is not based on the impartial investigation which would have been held had the Commission acted under the said section.

I would therefore vacate the order of the Interstate Commerce Commission because it is without jurisdiction. To arrive at any other conclusion is tantamount to saying that the Commission can close one legislative gap after another. The history of the Act leads only to one conclusion and that is that these gaps cannot be closed except by the Congress of the United States.