**BALTIMORE AND OHIO RAILROAD COMPANY et al., Plaintiffs,**

v.

**NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY and Boston & Maine Railroad, Defendants.**

United States District Court
S. D. New York.
July 9, 1961.

---

Alexander & Green, New York City, for plaintiff Baltimore and O. R. Co. (Donald M. Dunn, New York City, of counsel).

Clark, Carr & Ellis, New York City, for plaintiffs Atchison, T. and S. F. R. Co. and others (Charles D. Peet, G. Clark Cummings, New York City, Richard R. Bongartz, Philadelphia, Pa., and Smith R. Brittingham, Jr., Chicago, Ill., of counsel).

Richard E. Costello, New York City, for plaintiff Delaware, L. and W. R. Co.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for plaintiff Western Maryland R. Co. (Matthew V. Stepsis, New York City, of counsel).

Gerald E. Dwyer, New York City, for plaintiffs New York Central R. Co. and others (Jerome H. Shapiro, New York City, of counsel).

Richard D. Lalanne, New York City, for plaintiff Lehigh Valley R. Co.

Donovan, Leisure, Newton & Irvine, New York City, for defendants New York, N. H. and H. R. Co. and Boston and M. R. R. (Carl E. Newton, Granville Whittlesey, Jr., Peter B. Spruance, M. Lauck Walton, New York City, and Roger A. Clark, Washington, D. C., of counsel).

William T. Griffin, New York City, for defendant New York, N. H. and H. R. Co.

RYAN, Chief Judge.

In these 109 suits, which have been consolidated by the Court for all purposes, similarly situated railroad plaintiffs seek to recover from railroad defendants The New York, New Haven and Hartford Railroad Company and Boston & Maine Railroad per diem rental rates for the use by defendants of plaintiffs' freight cars at a rate of $2.40 from August 1, 1953 to December 31, 1956 and at a rate of $2.75 from then to date.

Plaintiffs have moved for summary judgment and to strike defendants' Fourth Affirmative Defense and Third Counterclaim as being insufficient in law and on the ground of res judicata.

Defendants have moved for a stay of all the suits pending final determination including judicial review, if any, of two petitions pending before the Interstate Commerce Commission to determine the reasonableness of past per diem rates.

We have before us as a result of extended pretrial hearings a rather voluminous and complete statement of agreed and undisputed facts.

The controversy revolves around the contractual obligation of defendants to pay the per diem rates established by three instruments: "The Car Service and Per Diem Agreement", "The Plan of Organization" and "Agreement No. 7". There is no dispute concerning the making of these agreements, or their execution by the parties. What is in dispute

is whether defendants withdrew from them in accordance with their terms.

As stipulated by the parties, the sole issue is: "whether the defendants are obligated to pay the amount of per diem published from time to time subsequent to July 31, 1953 and incorporated as changes in Rule 1(a) of the Per Diem Rules Freight published by the AAR since then." (¶ 24 S of F.)

Each of the several suits is based on "Car Service and Per Diem Agreement" (C.S.P.D.A.) subscribed to by each plaintiff and defendant and filed with the Association of American Railroads or its predecessor wherein each agreed to settle its monthly freight car hire balances at the per diem rate published in Rule 1(a) of the Code of Per Diem Rules— Freight, promulgated by the Association of American Railroads. The rates so published were $2.40 from August 1, 1953 to December 31, 1956; $2.75 from January 1, 1957 to November 30, 1959; and $2.88 since then. The amounts sought to be recovered by plaintiffs represent the difference between these rates and the interim payments made by defendants under a temporary settlement.

It is contended by defendants:

(1) that they are obligated to settle per diem balances only at the rate fixed by Rule 1 at the time they subscribed to the "C.S.P.D.A.", which for defendant New York, New Haven and Hartford was ninety cents when it subscribed in 1920 and for defendant Boston & Maine $1 when it subscribed in 1927, which rates by agreement were increased to $1.15 in 1945 (1st Affirmative Defense);

(2) that the "C.S.P.D.A." ceased to exist in that it was superseded by the later "Agreement No. 7" from which they withdrew in June, 1953; but that in any event if the first agreement continued in effect, plaintiffs may not recover under it because it is illegal under the anti-trust laws (2nd Affirmative Defense);

(3) that defendants have paid more than the reasonable rate for the use of the cars and are entitled to recover these overpayments (3rd Affirmative Defense and 2nd Counterclaim);

(4) that plaintiffs since January 1, 1947 have been conspiring to force defendants to pay fixed charges in violation of Section 5a(6) of the Interstate Commerce Act, 49 U.S.C.A. § 5b(6) and Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, in refusing to negotiate or agree to a reasonable rate outside the agreement and in filing these actions to enforce their illegal agreement (4th Affirmative Defense);

(5) that these suits are in breach of a written agreement by 88 of these plaintiffs not to bring suit, to settle on an interim rate pending final determination by the Commission of the proceedings before it and to be bound by the final determination of a reasonable rate by that body (5th Affirmative Defense).

By way of 3rd Counterclaim, defendants seek under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, treble damages incurred as a result of plaintiffs' coercive measures, their withholding of tariffs and their institution of administrative and judicial proceedings.

Plaintiffs reply that while defendants could have withdrawn from their obligation under the C.S.P.D.A. on three months' previous notice in writing to the General Secretary of the Association, they did not do so, that these agreements are continuing obligations not superseded by Agreement No. 7 and defendants' withdrawal, which is not disputed, from that agreement did not effect withdrawal from the earlier agreement. Plaintiffs also deny that the C.S.P.D.A. is illegal and assert that in any event this is a question which has been determined adversely to defendants by the Interstate Commerce Commission and the district court of Massachusetts.

Resolution of the issue before us requires a reading of the agreements in question and the circumstances surrounding their evolution.

*The Per Diem Rules Agreement:*

■ As early as 1902 the major railroads including the two defendants had

gotten together to work out a uniform system for freight car rentals on a per diem basis. The first formal agreement was the "Per Diem Rules Agreement", which made binding upon each of the subscribers per diem rules regulating rental of one another's cars. This had been promulgated by the American Railway Association—a voluntary association of which defendants and most of the major railroads were members.

Under it, each "subscriber railroad company promises and agrees with each railroad company severally which subscribes and files a counterpart hereof with the secretary of the American Railway Association, that the subscriber will abide by the rules governing settlements for the use of freight cars, adopted by the association and designated 'per diem rules' on the minutes of its proceedings; this agreement to continue for one year beginning July 1st, 1902, and thereafter until withdrawn on or after July 1st, 1903, by three months previous notice in writing to the secretary of the association."

By 1916 the dates in the Agreement had been eliminated and the "per diem rules" had been incorporated in a "Code of Per Diem Rules", and a "Code of Car Service Rules" governing the interchange, use and return of freight cars which had been adopted by the members of the American Railway Association.

Substantial changes were made in that year in the Codes, among them an increase in the per diem rate fixed by Rule 1 of the Codes and an increase in the power of the Association's Commission on Car Service created by the Code of Per Diem Rules to add to or modify any of the Car Service or Per Diem Rules. No provision was made for resubscription then or in the future by any of the railroads which had subscribed prior to that time in order to be bound by the changes then effected and further contemplated. That no such resubscription was considered necessary in order to make the changes binding on the various subscribers is clear from this and from the fact that subsequent changes in December, 1916 and 1917 were made and that both defendants settled their per diem balances accordingly.

In May 1917 the Esch Car Service Act (40 Stat. 101; amended by Transportation Act of 1920 (41 Stat 456, 476) now 49 U.S.C.A. § 1(10)–1(17)) was enacted imposing upon every carrier subject to the Interstate Commerce Act (I.C.A.) the duty to establish and enforce just and reasonable rules with respect to car service and declaring every such unreasonable rule or regulation unlawful. The Interstate Commerce Commission, which was given authority to establish such reasonable rules and punish for non-observance, created the Bureau of Car Service to administer its powers under the Act; this Bureau worked directly with the American Railway's Association's Commission on Car Service to help it establish and enforce reasonable rules and practices with respect to car service.

*The Car Service and Per Diem Agreement:*

In March 1920, upon the return by the Government of the railroads to their owners after wartime operation, "The Car Service and Per Diem Agreement" was made and counterparts were subscribed to and filed by most of the major railroads including the defendants.

This agreement provided:

"The subscribing railroad company promises and agrees with each railroad company severally which subscribes and files a counterpart hereof with the General Secretary of the American Railroad Association, that the subscriber will abide by and enforce the rules prescribed for the handling of and settlement for freight cars and included in the Codes of Car Service and Per Diem Rules, promulgated by the Association.

"Further, That the subscribing railroad company agrees to the creation of a Commission on Car Service with plenary powers as provided in Per Diem Rule 19, and which Commission shall be established and

maintained at Washington, and shall cooperate with the Interstate Commerce Commission in all car service matters on and between all railroads; and generally to act for the subscriber as its agent in all such car service matters as fully and as effectually as could the subscriber.

"Further, That the said Commission on Car Service is hereby designated and appointed as the agent of the subscribing railroad company, upon which service of all orders and directions with respect to car service, in accordance with the provisions as to car service of the Act to Regulate Commerce in force at the time, may be made by the Interstate Commerce Commission for and in the subscriber's behalf; a duplicate original of this agreement being filed by the subscriber with the Interstate Commerce Commission to evidence such designation.

"This agreement to continue until withdrawn by three month's previous notice in writing to the General Secretary of the Association."

This is the same agreement resubscribed to by defendant Boston & Maine [1] in 1927 with a change in the name of the American Railroad Association to American Railway Association and the substitution of a Car Service Division for Commission on Car Service; and it is the same agreement as that signed by other railroads after 1934, the date of the Plan of Organization, with the substitution of Secretary of the Transportation Section for General Secretary of the American Railway Association.

The Commission on Car Service had as its Chairman one of defendant Boston & Maine's officers, and the Special Committee established by the Association included among its members the President of defendant New York, New Haven and Hartford. It was recommended by this Special Committee that the Association make a complete study and revision of the C.S.P.D. Rules; this recommendation was approved by the membership of the Association of Railway Executives to which defendants belonged. From 1920 to 1934, changes in the rules were made upon approval by letter ballot of the members of the Association owning a majority of the revenue freight cars. In 1934 the Association of American Railroads was formed, and the predecessor organization ceased to exist. Every change in the Association and its By-laws and Plan of Organization was approved by its members. Defendants were and remained members of these organizations during the periods they existed. In fact at the time of the change, presidents of both defendants became directors of the Association of American Railroads.

While the Committee was studying changes in the Rules, the ICC, because of a shortage of cars, issued several temporary orders amending, superseding or suspending the car service rules promulgated in March, 1920 by the Association of American Railways. It was clear that such changes were contemplated and that all subscribers were to be bound unless they withdrew from the agreement as provided by its terms.

From the language of the two agreements requiring explicit withdrawal upon three months' notice; from the fact that changes in the Rules and rates were made prior to, during and after subscription by the several railroads by the ICC and the Association's Commission on Car Service; from the fact that under both agreements each pair of subscribers agreed to enforce the rules, that the subscribers in 1920 contemplated and directed study and revision of the Codes, that many revisions have been made since 1920 and that there has never been general resubscription by any member, it is evident that the entire purpose of the agreements was to bind the various subscribers without the need for resubscription following each change.

---

[1]. Resubscription was for itself and for railroads other than those in 1920; since that time neither defendant ever resubscribed to any other C.S.P.D.A.

That this was the plain understanding of the defendants is clear from their actions during the entire period. While the parties were operating under the 1916 "Per Diem Rules Agreement", the rate had been raised to 75¢ and dropped to 60¢ and both defendants had settled at these rates during the time they were in effect. When the defendant New Haven entered into the 1920 Agreement, the rate was 90¢, whereas when the defendant Boston & Maine resubscribed to an amended agreement in 1927, it had risen to $1, and defendant New Haven, while it did not resubscribe, considered itself bound.

The rate of $1 remained from 1920 to 1945, at which time it was raised to $1.15; in 1947 to $1.25 and $1.50; in 1949 to $1.75; in 1952 to $2; in 1953 to $2.40; in 1957 to $2.75; in 1959 to $2.88. But it was not until 1953 that defendants refused to abide by the rate of $2.40 on the theory, now put forward, that they were not bound without resubscription beyond the rate fixed at the time they subscribed. Throughout the years, defendants participated in the organization and procedures of the Association of American Railroads and in the later "Agreement No. 7", in connection with per diem rate increases and other changes. While in 1947 and 1952, the defendants voted against any increase, this was clearly action on their part which would have been unnecessary had they not felt bound by the increases, as was also their participation in 1946 in the proceedings before the Commission on a complaint that the rates were too high (Alabama v. Aberdeen, 274 ICC 383 (1949)). Certainly it was the understanding of the Commission that all subscribers continued to be bound by the increased rates under the C.S.P.D.A. until withdrawal. (Rules for Car Hire Settlement, 160 ICC 369; 165 ICC 495 (1930); Car Service Freight Cars, 268 ICC 687 (1947); Alabama v. Aberdeen, supra.)

We conclude that so long as defendants remained subscribers to the C.S.P. D.A., they were bound by all future rates fixed in accordance with the agreed procedures. If this were not so, either the railroads would be paying different rates for the same cars depending on the rate fixed at the time of their subscribing, or every time the rate was changed there would be the need of resubscription by all. This would not be promoting the establishment of an efficient and uniform system for the interchange of cars.

We now turn to examine "Agreement No. 7" of 1950 and the Plan of Organization of 1934, which it incorporates.

*The Plan of Organization of 1934:*

It is recited in the preamble that its purpose is to establish an authoritative national organization to deal with matters affecting the railroad industry where concert of policy and action are required. Pursuant to this purpose, the Association of American Railroads was created to deal with all these matters; the general supervision of the affairs of the Association was entrusted to a Board of Directors, elected by the member roads. Some of the directors would serve on an Executive Committee established to recommend to the Board policies and rules and regulations to promote efficiency and economical operation of railroad business. It provided that matters pertaining to Car Service, etc., were to be dealt with by the Operation & Maintenance Department (Article 12) and that rules and regulations were to be promulgated by the President and Executive Committee and established by member roads voting according to equipment ownership (Article 18).

Under Article 19, all disputes between the members of the Association were to be submitted to the Board of Directors whose decision was to be accepted and carried out by the members or submitted to arbitration. Under Article 22, it was directed that all carriers upon becoming members of the Association were to execute a "form of contract" which was attached to the plan and which bound each member to the provisions of the Plan so long as he remained a member of the Association "reserving the right, however, to cease to be a member upon the expiration of ninety days after giving

written notice of intention to withdraw from membership". .

In 1946 and 1947, by letter ballot of all the members of the Association (including both defendants and all plaintiff members), the Plan was revised in order "to omit language in the existing Plan which could be regarded as making the action of the Association authoritative or binding on its members." (See Ex. 39—letter from President of AAR.) Instead, a new Article 23 (later Article 24) was added providing that

> "Nothing in this Plan shall in any way prohibit or restrain any member road from acting individually and independently of the Association or of any and all other members roads with respect to any of the matters covered hereby, and the right of individual and independent action is expressly reserved to each member road."

The exercise of this right was not conditioned upon prior notice. From that time to 1950 each of the rate increases from $1.25 to $1.50 and then to $1.75 was made effective under the procedures of this Plan after majority vote of the car owning members of the Association, subject of course to the right provided by this Article. Defendant Boston & Maine voted in the affirmative to the $1.25 increase—and as it had to the $1.15 increase in 1944 and in the negative to the other increases; but defendant New Haven voted in the negative as to all—however, both defendants continued to abide by the rates so established until August, 1953 when the $2.40 rate went into effect.

The Plan contained no explicit provisions obligating the members of the Association to enforce or abide by the rates established, or reference to the Car Service and Per Diem Agreements. The plaintiffs, therefore, would limit this right of independent action only to the procedures established by the Plan for determining the per diem rates, and not extend it to the underlying obligation contained in the earlier agreement. However, it was not necessary that the Plan spell out any obligation because the parties recognized that they were bound by the underlying C.S.P.D.A. and that the Plan had become an integral part of that agreement. Any provision or amendment in the Plan qualifying or enlarging the parties' rights and obligations effected a parallel change in the rights and obligations of the earlier agreement.

Aside from the emptiness of the right argued for by plaintiffs, the language of the article does not bear out any such restriction. The right conferred is to act independently and individually "of the Association or of any and all other member roads" with respect to "any of the matters" covered by the Plan, which certainly included per diem rates. The clause which it superseded—Article 19— was concerned with "controversies between members" over matters subject to the jurisdiction of the Board of Directors which controlled the activities of the Association and which encompassed among its many activities the establishment of per diem rates.

Consequently, the right to act independently extended not only to action taken by the Association and binding on its members by reason of membership (such as procedures for establishing rates) but also to any action taken by the members among themselves in order to make the action of the Association mutually binding upon one another— such as the C.S.P.D.A. This was the very purpose of the amending article—to free the agreement of the parties (contained in the C.S.P.D.A.) from a charge of joint price fixing that might be held to be illegal under the antitrust laws. See United States v. A. A. R., "The Lincoln case", D.C.1945, 4 F.R.D. 510; Georgia v. Penn. R. R. Co., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051.

On June 17, 1948, the Reed-Bulwinkle Act (Section 5a of the I.C.A., 49 U.S.C.A. § 5b) was passed conferring immunity from the antitrust laws on rate-making agreements of common carriers upon approval of the Commission. Section 5a (9) of the Act, in pertinent part, pro-

vides that, if approval of an agreement is not prohibited by subsections 4, 5 or 6 of the Act, "parties to any agreement approved by the Commission * * * are * * * hereby relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission."

The Commission may not under Section 4 approve an agreement unless it comes within subsection 2 and is in furtherance of national transportation policy; nor under subsection 5 if it relates to a pooling or division, etc.; nor under subsection 6 "unless it finds that under the agreement there is accorded to each party the free and unrestrained right to take independent action either before or after any determination arrived at through such procedure."

*"Agreement No. 7":*

We now turn to Agreement No. 7, which was dated April 1, 1950 and became effective October 7, 1950. On February 28, 1950, upon application of *581* common carriers including plaintiffs and defendants, the Interstate Commerce Commission under Section 5a of the Interstate Commerce Act had approved the agreement. Section 5–a, Application No. 7, 277 ICC 413. It provided, in part, that—

> "It is Hereby Agreed, between and among the several railroad companies subscribing hereto * * * that the organizations and procedures for the joint consideration, initiation or establishment, and adjustment from time to time, of (a) the per diem rate of compensation payable for the use of foreign line freight cars, (b) mileage rates of compensation payable to owners of freight cars for the use thereof, (c) demurrage and storage charges payable by shippers for the use of railroad freight cars and facilities, and (d) rules and regulations pertaining

to such rates or charges, shall be in accordance with the provisions of this agreement."

Section I provides that the Board of Directors of the Association of American Railroads shall be constituted and the members thereof selected in accordance with the Plan of Organization of said Association, which was made a part thereof. Section II provides that the sixteen member General Committee— Operating-Transportation Division in the Association's Operations and Maintenance Department shall be constituted and elected as provided in Article 10 of said Plan of Organization.

Section III provides that the General Committee upon its own intiative, at the direction of the Association's Board or at the instance of subscribers to said Agreement owning not less than 20% of the revenue freight car ownership of all subscribers " * * * shall from time to time consider the desirability of change of current rates of per diem, mileage, or demurrage and storage charges, or of any rule or regulation pertaining * * *." thereto and report its recommendations to the Board. Provision is made for minority reports. The General Committee is to " * * * consider proposals for changes in demurrage or storage rates and charges, or rules or regulations pertaining thereto, submitted by duly designated committees of interested shipper organizations, including the National Industrial Traffic League * * *" and to handle the same in accordance with the procedures provided for in the agreement.

Section IV provides that following the receipt of such report or reports the Board of Directors of the Association " * * * shall consider the same and shall thereupon, in accordance with its judgment as determined by a majority vote of its members, determine what, if any, proposal for change in the per diem, mileage, or demurrage and storage rates and charges, or in the rules and regulations pertaining thereto, shall be submitted to letter ballot vote of the subscribers. * * * The affirmative vote

of subscribers owning a majority of the revenue freight cars owned by all subscribers shall constitute approval of any change so submitted to the subscribers."

Section V provides that, if the Board shall fail or refuse to submit a proposed change to subscriber vote which shall have been proposed on behalf of subscribers owning not less than 20% of the revenue freight cars owned by all subscribers, that owners of not less than such percentage of the revenue freight cars owned by subscribers may require such submission.

Section VI provides: "Following approval as here in provided of any proposed change in rates or charges, or in the rules and regulations pertaining thereto, the said Association shall cause the same to be made effective through tariff publication or otherwise, as may be appropriate, and take all proper steps to that end."

Section VII provides that upon the affirmative vote of three-fourths of its membership the General Committee may effect changes in rules and regulations relating to per diem, mileage or demurrage and storage but that in the event of objection the recommended change or changes shall be submitted to the Board of Directors in accordance with the provisions of Section III.

Section VIII, originally approved, provided that when the General Committee had under consideration the possible change in the per diem rate or in any rule or regulation pertaining thereto, a representative of the American Short Line Railroad Association should be entitled to attend throughout the General Committee's deliberations but without right to vote. Effective February 1, 1958,[2] this provision was amended to provide that the Short Line Association representative should be a member of the General Committee having the same rights as any other member thereof for the consideration of per diem rates and rules and regulations relating thereto.

This section also provides that, when the General Committee is considering changes in mileage rates for the use of privately owned freight cars and changes in demurrage or storage rates and charges or in rules and regulations pertaining thereto, it shall publish notice in a recognized traffic journal.

Section IX provides: "The subscribers hereby adopt, and agree to continue in effect until changed pursuant to the procedures herein provided, the existing rates, charges, rules and regulations, subject, however, to the rights of withdrawal, independent action, or of recourse to the Interstate Commerce Commission, hereinafter provided for."

Section X provides that any common carrier by railroad subject to the Interstate Commerce Act may become a party to Agreement No. 7 by subscribing to a counterpart thereof and delivering it to the Secretary, Operating-Transportation Division of the Association and that any subscriber may withdraw at any time by written notice to said Secretary.

Section XI provides that nothing contained in the Agreement shall be construed to prevent or limit recourse to the Interstate Commerce Commission by any subscriber for any relief (in pending proceedings or otherwise) accorded by law in respect of any of the matters covered thereby.

Section XII accords to all subscribers the free and unrestrained right to take independent action either before or after any determination arrived at through the procedures therein provided.

Section XIII provides that the Agreement would become effective, subject to approval by the Interstate Commerce Commission, when the same or counterparts thereof had been duly executed as to per diem, mileage, and demurrage and storage by railroads owning or controlling two-thirds of the railroad-owned or controlled revenue freight cars used in interchange in the continental United States.

---

2. Following the decision of the ICC in Ahnapee v. Akron, 302 ICC 265, 300 ICC 73 (1957).

Section XIV appoints the President of the Association as attorney-in-fact for each subscriber to file an appropriate application for approval by the Interstate Commerce Commission.

Section XV provides that the Agreement shall bind and inure to the benefit of the successors and assigns of the subscribers.

The last clause of the Agreement permits subscribers to restrict their participation to one or two of the three subjects covered by the Agreement, i. e. per diem, mileage, or demurrage and storage.

In approving Agreement No. 7, the Commission found that it merely sought to continue, with necessary modifications and improvements, the general plan enacted and observed by the carriers in the Code of Per Diem Rules and approved by the Commission in Rules for Car Hire Settlement, supra.

By express provision, the Plan of Organization as amended in 1947 was made a part of Agreement No. 7 and the procedures and organizations followed under it for the initiation and establishment of per diem rates were continued in substantially similar form.

The per diem charges continued to be published in Rule 1(a) of the Codes and to be published in the AAR Circulars as having been submitted to letter ballot vote of the "subscribers" to the No. 7 Agreement and the effective rate to have been the result of the affirmative vote of these "subscriber" roads.

In Agreement No. 7, as in the Plan of Organization, there was no obligation spelled out on the part of the subscribers to obey the changes contemplated to be made under the procedures set out—also for the reason that the parties continued obligated to do so under the Car Service and Per Diem Agreement.[3]

The Agreement, however, did make more concrete and specific the right of independent action first provided for in the Plan by setting forth that it might be exercised before or after determination of the rate, either by withdrawal from the agreement at any time or by recourse to the Commission for relief. But, because no reference is had in this connection to the C.S.P.D.A., the plaintiffs make the same argument as that made against the Plan: that this right was not intended to extend to the obligation to abide by and enforce the rates imposed by that earlier agreement, and that consequently withdrawal from Agreement No. 7 in the exercise of the right there provided did not amount to withdrawal from the C.S.P.D.A.

As in the Plan, neither the language of Agreement No. 7 nor the events surrounding its making support this narrow interpretation. In the first place, the Agreement not only contains its own explicit language conferring this right in Sections 9, 10, 11 and 12, but it also incorporates the right as contained in Article 23 of the Plan, which we have found extended to the C.S.P.D.A. obligation. Secondly, the plaintiffs argued before the Commission in the Section 5–A proceedings in defense to the antitrust charges leveled against the agreement by the Department of Justice: " * * * it is beyond peradventure clear that action independently by any party to the instant agreement * * * would involve no contractual breach whatever. The agreement provides no sanction against nonconformity." (Brief dated July 20, 1949, Section 5–A proceedings, p. 30.) And they went on to illustrate that the right was not illusory, as the Department argued, but very real in that if one carrier using another's car refused to pay the rate established under the Agreement, the car owner would be powerless to interfere with the use of its car and would be relegated either to seek relief in a court for compensation on a quantum meruit basis or in the Commission for determination of a reasonable rate, an interpretation which was adopted by the Commission when it approved the agree-

3. Since per diem rates were not required to be published as tariffs, there was no statutory obligation to abide by them; while they have been filed since 1947 by order of the Commission, no obligation to abide by them arises from this filing.

ment under subdivision 9 of the Bulwinkle Act, supra; and similarly, in Ahnapee v. Akron, 302 ICC 265, 268, where it found that the right "assures any subscriber against being bound by the rate established through joint consideration under the procedures provided in the agreement."

Since the only obligation binding the parties to the rates established was to be found in the C.S.P.D.A., it follows that this provision of No. 7 modified and narrowed the obligations of the earlier agreement and to the extent that the provisions of that agreement were inconsistent with those of No. 7, they were superseded and replaced. All of which means that the defendants could effectively withdraw from their obligation under the C.S.P.D.A. by withdrawing at "any time" from No. 7 on written notice to the Secretary under Section X—instead of having to continue bound until withdrawal on three months' previous notice in writing as required by the C.S.P.D.A.

Plaintiffs concede that defendants withdrew from Agreement No. 7 on June 10, 1953 in so far as it pertained to per diem and became, along with several other railroads, subscribers to the revised Agreement of 1958 only as to mileage and demurrage and storage, but not per diem. We have seen that such limited participation in the Agreement was specifically provided for therein.

Shortly after August 1, 1953, both defendants sent letters to all car owning roads, including plaintiffs, to the effect that they had withdrawn from the agreement and were no longer bound by the increased rates—that there was no agreed rate between them and that an understanding was necessary as to the rate to be paid. Most of the plaintiffs replied that they would insist on the $2.40 rate as fixed by No. 7 as a fair rate; none at that time questioned the defendants' right to withdraw.

From 1953 on, defendants have not paid the amounts determined under the No. 7 procedures but by independent action have continued to use plaintiffs' cars and have made interim settlements of about $2 per diem, which plaintiffs claim is not reasonable compensation.

The fact that after notice of withdrawal defendants continued to receive the letter ballots of the Association containing proposals for changes in all rates—per diem, demurrage and mileage—along with the remaining subscribers to No. 7, is not at all significant, for there was but one list in 1950 of No. 7 subscribers whether they were limited or full subscribers. The list continued to include any subscriber to any one of the three subjects covered even though the subscriber may have withdrawn as to one or two; and even though after the 1958 modification of the Agreement the carrier, as did the defendants, may have resubscribed but not to per diem. After 1953 neither defendant voted on any of the proposals to increase the per diem rate but continued to vote on proposals of other subjects covered by No. 7.

As we interpret Agreement No. 7, the effect of defendants' withdrawal was that they were no longer bound under the C.S.P.D.A. to pay the rate of $2.40 established under Agreement No. 7 on July 31, 1953. Under Sections XI and XII, the exercise of the right to seek relief from the Commission required no notice and none was given by either side; however both exercised it in the Fall of 1953, plaintiffs by petitioning the Commission to declare the rate of $2.40 reasonable; defendants by answer, petitioning the Commission to find that rate unreasonable and to fix a fair rate.

This does not mean, however, that defendants are immune from suit and that they may continue to use plaintiffs' cars without paying a reasonable rate. The right of independent action, while it frees defendants from the obligation to pay the rate determined by the majority of the car owning roads under the No. 7 procedures and protects them from economic duress and discriminatory treatment by plaintiffs upon refusal to pay the demanded rate (Ahnapee v. Akron, supra), does not immunize them from suit on the part of plaintiffs in

order to attempt to collect charges for the use of their cars. Ahnapee v. Akron, 300 ICC 73, 79, 80, 84. The parties had a valid contract, from which defendants have withdrawn as provided therein. Plaintiffs are entitled to attempt to collect the rate established as reasonable and, if declared unreasonable, to be made whole on a quantum meruit basis, provided, that is, there was no agreement to waive or withhold enforcement of this right. This brings us to defendants' contention by way of Fifth Affirmative Defense that plaintiffs contracted not to file suit pending a determination by the Commission.

In 88 of the 109 cases before us, defendants have pleaded a written agreement between the plaintiffs and defendants which they allege consists of an agreement to settle per diem balances at an interim rate pending final determination of ICC proceedings in ICC Docket No. 31358 and review thereof; an agreement to be bound by the final determination of a reasonable rate of per diem compensation by the Interstate Commerce Commission at the conclusion of the ICC proceedings and any court review thereof, or by a determination of a reasonable rate by a Court thereafter or by a settlement of such rate by agreement between the parties; an agreement of defendants not to invoke the statute of limitations against any suit by plaintiffs; and an agreement by plaintiffs to forbear from any suit on per diem balances claimed due until the conclusion of the ICC proceedings and any court review thereof.

It is defendants' claim that the institution of these suits constitutes a breach of this agreement. As to 21 plaintiffs, defendants have not pleaded such defense.[4]

These alleged contracts are contained in correspondence exchanged and in formal agreements executed by the parties following the institution of the Commission's proceedings No. 31358 in September 1953, which according to defendants expressly or impliedly contain such a promise because they are "interim settlement agreements."

Plaintiffs admit one express agreement not to sue—entered into on January 30, 1959 between defendant New York, New Haven and Hartford and plaintiff C. M. St. P. & P. which unequivocally provides that each party agrees "to take no steps of any kind to collect any amount" until 90 days after a final unappealable judgment.

Plaintiffs deny, however, any implied promise not to sue to be found in the interim settlement agreements and allege that defendants have breached such agreements and that they should be estopped from pleading this defense in that it has been their position before the Commission that the Court and not the Commission had jurisdiction over the past rates here involved, and that defendants so argued to the Commission and explicitly stated that, because of their contention, they were not asking for a stay of the actions pending here. (Docket No. 31358).

The defendants answered eleven of these actions on the merits in September, 1959 and in the others sought extensions of time. On December 15, 1959, defend-

---

4. Twelve of the cases are instituted against the Boston & Maine Railroad and the 12 plaintiffs are as follows: Atlantic Coast Line Railroad Co., Central of Georgia Railway Co., The Central Railroad Co. of New Jersey, Chicago & Illinois Midland Railway Co., Great Northern Railway Co., Lehigh Valley Railroad Co., The Pittsburg & Shawmut Railroad Co., Rutland Railway Corporation, Savannah & Atlanta Railway Co., Southern Railway Co., Spokane Portland & Seattle Railway Co., and The Texas & Pacific Railway Co.

Nine of the cases are instituted against the New York, New Haven & Hartford Railroad Company, and the nine plaintiffs are as follows: Akron, Canton & Youngstown Railroad Co., Central of Georgia Railway Co., The Central Railroad Co. of New Jersey, Chicago & Illinois Midland Railway Co., The Detroit & Toledo Shore Line Railroad Co., Lehigh Valley Railroad Co., Rutland Railway Corporation, Southern Railway Co., and The Texas & Pacific Railway Company.

ants moved for a stay of these proceedings pending determination by the Commission and it was not until December 21, 1959 that they filed their answers for the first time alleging these agreements.

*The Formal Agreements:*

■ There were 23 so-called formal agreements (one of which plaintiffs have admitted) entered into subsequent to the Commission's decision in No. 31358, October 17, 1955, upholding the $2.40 rate as reasonable. In that proceeding, defendants had questioned the applicability of a declaratory order to the proceedings because there had been no hearing but did ask the Commission to determine that the rate they were offering to pay was reasonable. With the filing of the statutory court suit on November 27, 1956 (Boston & Maine v. United States, D.C., 162 F.Supp. 289), the question of the Commission's jurisdiction was squarely brought up by defendants.

Of the 23 agreements, 17 were entered into prior to the filing of that suit and the balance after the filing of that suit.[5] These 17 contain a promise by defendants not to plead the Statute of Limitations as a defense to any Court proceeding for the collection of per diem balances and to make retroactive adjustment to July 1953 on the basis finally determined by the Commission, including judicial review, "in consideration of plaintiff's foregoing institution of suit until a reasonable time after determination of Docket No. 31358 including any judicial review"; one agreement even contemplates the making of new findings should such judicial review result in further consideration and determination by the Commission. Of the remaining four which were made in 1957, the first provides that each party's promises are "in consideration" of forbearance of suit by the other for a similar period and the other three recite that there has been an appeal from Docket No. 31358 and that the controversy may not be "finally decided for a long period of time" and that "the parties desire at this time to withhold the filing of suit until a reasonable time after termination of No. 31358"; of the remaining two, one was made in December, 1958 and although it contains no explicit promise by plaintiffs to forbear from suit, it does contain a promise by defendants to waive the Statute of Limitations "in case it may be necessary to institute suit"; the last agreement that of January, 1959 contains an express promise not to sue.

We have no difficulty in concluding that the parties in the 23 formal agreements agreed not to file suit against each other and not to raise the Statute of Limitations in the event of ultimate suit until a reasonable time after final determination by the Commission of the reasonableness of the rates including judicial review and possible further determination by the Commission—on remand by the Court. That this was a promise not to file suit during the period specified is further borne out by the fact that they agreed eventually to settle the per diem rates retroactively to August, 1953 at a rate finally approved by the Commission and to accept interim payments. The agreement to settle at the rate fixed by the Commission would belie an intention to sue to establish that rate. These agreements constitute a binding contract—the consideration being temporary payment on the one hand and final settlement in exchange for a promise of no suit during a specified period.

*The Correspondence:* [6]

■ There are 74 letters which defendants maintain constitute agreements not to sue. All the letters provide for

---

5. Dockets Nos. 151–247; 151–254; 151–255; 151–241; 154–148; 151–203; 151–220; 151–221; 151–228; 151–207; 151–206; 151–211; 151–224; 151–226; 152–132; 151–214; 151–243.
    Dockets Nos. 151–239; 151–233; 151–253; 151–257; 151–246; 151–204.

6. Dockets Nos. 148–339; 151–202; 151–213; 151–216; 151–217; 151–218; 151–219; 151–222; 152–99; 151–229; 151–361; 152–97; 152–101; 152–133; 152–265; 152–268; 152–327; 60 Civ. 1811; 151–215; 148–216; 151–201; 151–209; 151–231; 151–227; 151–234; 151–235;

interim partial payments of $2 until resolution of the per diem controversy and for retroactive settlement of the rates to August 1, 1953. In 9 instances, there are formal agreements in addition to the letters, and in view of our conclusion on these, there remain only 65 letters to be examined.

With the exception of 8, all the letters provide for interim payments pending a final determination of the Interstate Commerce Commission proceedings by explicit reference to Docket No. 31358; it is clear from a reading of the 8 letters in which the proceedings are not so described that those—the only per diem proceedings pending at the time—were the proceedings which the parties had in mind as fixing the time for interim payments. The majority of the letters also contain a provision that such interim settlements would not be used to the prejudice of any party before the Interstate Commerce Commission in those proceedings. The letters contain no waiver of the Statute of Limitations but in most cases plaintiffs have requested such a waiver and defendants have agreed. In fact in 1957, after the question of the Commission's jurisdiction had been appealed by defendants in the three-Judge statutory suit, some of the plaintiffs wrote to defendants, requesting a clarification of their interim agreements in view of the fact that termination of the controversy seemed not in sight and requesting particularly a waiver of the Statute of Limitations "in order to avoid the necessity for filing suits now to protect our claims, and also to forestall any misunderstandings."

While relinquishment of the right to bring suit is not to be lightly implied unless the intent to do so is clear, and especially not in this case where the amounts in issue are so large and counsel such indefatigable adversaries, we conclude from the letters as well as the agreements that such was the intent of the plaintiffs. As in construing any contract, it is the totality of the actions and words that give evidence of the parties' intent.

Here, the fact that there was an interim sum agreed on with a provision for reciprocal adjustment upon the completion of a definite event, that payments have been made and continue to be made as agreed, that most of the letters were initiated by plaintiffs and that 22 of these were written or modified after the defendants sought judicial review of the Commission's decision in Docket No. 31358, that plaintiffs became concerned over the running of the Statute of Limitations and requested waivers from defendants, which defendants gave, that the situation of the parties to the letters was similar to that of the parties to the formal agreements of waiver and forbearance—justifies a finding that implicit in these arrangements was a promise by plaintiffs not to bring suit until a final decision by the Commission or a Court in Docket No. 31358 in exchange for a concurrent promise by defendants to be bound by the Commission's rate and to pay such rate beginning with August, 1953. The letters and agreements dated after November 27, 1956, when the parties sought judicial review of the Commission's decision and the continuation of the interim payments, after that date, are evidence that the parties envisioned the possibility of a finding of lack of jurisdiction in the Commission.

While perhaps the pre-1956 agreements contemplated no such jurisdictional challenge to the Commission, certainly experienced and astute counsel were aware that such challenge might come sua sponte from the Commission or from the reviewing Court.

152–328; 60 Civ. 1812; 148–338; 151–249; 148–214; 151–230; 151–256; 152–266; 60 Civ. 277; Dockets Nos. 151–212; 152–190; 151–242; 151–363; 151–236; 151–208; 151–232; 152–134; 151–251; 151–238; 152–267; 151–362; 152–100;

152–98; 151–252; 60 Civ. 276; 152–102; 152–103; 151–244; 152–189; 151–185; 151–184; 148–322; 148–323; 149–38; 149–39; 149–40; 151–205; 151–240 and 151–223.

Whatever plan may have lurked in the heart of defendants when they invoked the aid of the Commission, agreed to await its determination to finally settle their dispute, and then proceeded to attack its power to give the very aid they had sought and were purportedly awaiting, we cannot say that this conduct was evidence of such bad faith as to bar them from now relying on these agreements as a defense to these suits. The Commission proceedings are still pending; there has been no determination of any kind, and plaintiffs did promise to withhold suit pending a decision.

However, in fairness to plaintiffs, we cannot overlook the fact that, while they were pursuing their remedy before the Commission in good faith—as contemplated by Agreement No. 7—defendants' shifting position before the Commission has resulted in much delay and wasted effort to the financial detriment of plaintiffs whose cars the defendants continue to use.

In the end, whether the Commission is found to have jurisdiction or not, plaintiffs will have to resort to this Court to obtain a judgment for the rate, be it determined by the Commission or by this Court.

We realize that ordinarily the finding of such a promise would dictate a dismissal without prejudice of these 88 suits; but all the suits have been consolidated, they contain identical questions of fact and law, and so much judicial time and effort—as well as on the part of all counsel—has already been consumed on them that we do not think the interests of justice will be served by a dismissal of these suits now, with the possibility of the need for a refiling and retrial in the future. What we will do is to hold up the entry of judgment in favor of these 88 plaintiffs as against the defendants until final disposition of the Commission proceedings.

Lest there be any question as to defendants' liability under these agreements in the event of a final decision in favor of the Commission's power to fix past rates, we specifically find that defendants in exchange for plaintiffs' promise not to sue, which we uphold, agreed to pay back to August 1, 1953 whatever rate is fixed by the Commission —if it be more than $2, they agreed to pay the difference; if it be less, then plaintiffs agreed to credit them with the difference, if any.

Since we have the contracts before us and since we have had to examine them to determine what the parties surrendered and obtained, we have power to make a final finding that under these contracts defendants promised to be bound and pay the rate fixed by the Commission after final decision.

We conclude that the interests of justice and an end to these interminable proceedings dictate such a disposition. After all, this accords with defendants' argument before the Commission in 1959, when 11 of these suits had been filed that it was not seeking a stay of the suits filed here because this was the proper forum to determine the question of their contractual liability.

And this brings us to defendants' claim that, regardless of contract, they are not bound to pay any rate over that of $1.15 in existence in 1947 because since that time the plaintiffs' activities in fixing the rates and forcing defendants to pay them are in furtherance of a conspiracy in violation of Section 5A of the Interstate Commerce Act and of the Sherman Act; and to plaintiffs' reply that such a claim and defense is insufficient in law and that in any event the matters pleaded by defendants have been determined adversely to them by the Commission and the Massachusetts and Supreme Courts. Ahnapee v. Akron, supra; and Boston & Maine v. United States, supra.

There is no question but that railroads, as any other industry, are subject to the strictures of the antitrust laws. Georgia v. Penn. R. R. Co., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; Eastern R. President Conference v. Noerr Motor Freight, 1961, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464.

The Esch Car Service Act, when it directed the railroads to get together to establish reasonable rules and regulations for the interchange of freight cars, simply authorized the railroads to establish joint rates. It may have immunized them from a charge of entering into a price fixing agreement illegal per se but it did not protect other activities proscribed by the antitrust laws. Boston & Maine v. United States, supra; Atchison, Topeka & Santa Fe Ry. Co. v. Aircoach Transp., 102 U.S.App.D.C. 355, 253 F.2d 877; Seatrain Lines v. Pennsylvania R. Co., 3 Cir., 207 F.2d 255.

It is conceded that the rates since 1947 have been fixed in accordance with procedures established by the agreements, and that Agreement No. 7 and the Plan of Organization were within the scope of the Bulwinkle Act and approved by the Commission upon the joint petitions of plaintiffs and defendants.

Defendants, however, seek to escape all liability prior to and since withdrawal from Agreement No. 7 because of the following alleged acts on the part of plaintiffs pleaded in "The Fourth Affirmative Defense", which pleads that:

"Beginning around January 1, 1947, the alleged conspirators-plaintiffs and 'other large car-owning railroads'—'in concert and combination' have successively and repeatedly increased the 'domestic market prices of freight car rentals in the United States, to force the defendant and other railroads who did not assent to the per diem charges so fixed by the conspiracy to pay' the same. The successive increases in per diem charges—beginning with the increase to $1.25 effective June 1, 1947 and continuing to the increase to the present rate of $2.88 —are alleged to have been effected by utilizing the 'processes and procedures of the AAR' including the provision embodied in Agreement No. 7 that the vote on changes in the per diem rate should be weighted according to the number of cars owned by each road—one vote for each car owned."

Defendants are alleged to be "predominantly traffic-terminating" railroads who, because of the requirement of Car Service Rule 1 as to priority in loading of foreign-line cars, cannot "economically or usefully acquire large car-ownerships" and "accordingly have no effective voice in the fixing of the per diem charges under the AAR weighted voting procedures". It is alleged that one of the objectives of the aforesaid conspiracy was, for the financial benefit of the large car-owning predominantly traffic-originating roads, to exploit the captive market for the use of their cars * * * " and it is further alleged that after defendants' withdrawal from Agreement No. 7 in respect of per diem, defendants offered to negotiate with plaintiffs a new rate of per diem but received no response to such offer, that they suggested to plaintiffs various rates of per diem related to the ages of the cars involved, that plaintiffs refused to furnish such information, that they have sought to deny defendants their rights, under Section 5a of the Interstate Commerce Act and under Agreement No. 7, to take independent action and have "at all times insisted that defendants pay the rental charge fixed in concert and combination under the aforesaid AAR procedures." That in arriving at such rental charges, plaintiffs "did 'load' the calculations of so-called costs of ownership of freight cars through the use of biased, selected, and factually unsupported estimates and other guesswork, the injection into the calculations of extraneous costs additional to the actual costs of ownership of freight cars used in interchange, the use of various methods of calculation which would achieve colorable mathematical support for ever higher increases in the per diem charge, and by successive changes in their formula of calculation, —always in a direction which would provide colorable support for a higher end-result figure, * * * and to provide a colorable base whereby to induce the Commission and/or the Courts to sanc-

tion the end-results of their unlawful conspiracy, and their intended price-fixing exploitation of the terminal roads."

Plaintiffs are alleged to have utilized "principles of calculation different from and yielding colorable support for much higher rates of charge than, the principles of calculation approved by the Interstate Commerce Commission for use in calculating the levels of maximum permissible tariffs, chargeable to shippers by the rail carriers." "For a specific example * * * in 1953, in preparation for their intended per diem increase to $2.40, the conspirators substituted estimated reproductions value as the depreciation base in lieu of original cost (ledger value), which they had theretofore used in calculating previous per diem increases"; that they have fixed per diem charges that were uniform alike for all freight cars used in interline service of whatever age, type, cost or condition and however limited in versatility of usefulness, with the intended effect and result of giving incentive to car-owning roads to keep in service as long as possible the old-low-cost inefficient freight cars.

The railroads serving the "granger" states are alleged to be among the prime movers in the conspiracy and to have "for many years propagandized the Interstate Commerce Commission and the Senate Committee on Interstate and Foreign Commerce to the effect that the predominantly traffic-terminating carriers * * * are appropriating their cars and that an increase in the per diem rate will increase the car supply and thus eliminate the recurrence of 'car shortages' in the granger states at harvest time." In furtherance of the conspiracy, plaintiffs are alleged to have utilized the process of the Interstate Commerce Commission to make increased per diem charges binding upon the defendants, and to be utilizing that process of the Court in the present actions to force payment of such per diem charges.

Defendants' Third Counterclaim repeats and realleges these allegations and further alleges that certain unnamed plaintiffs have applied coercive measures to defendants (including "the withholding of divisions of tariffs") in an attempt "to force and coerce defendant into agreeing to pay, and to pay, the amounts of car-hire charge fixed by the conspiracy as hereinbefore alleged" for all of which plaintiffs seek judgment under Section 4 of the Clayton Act in the trebled sum of $21,000,000.

Before taking up the legal sufficiency of this defense and counterclaim, we turn to examine plaintiffs' contention that the matters there pleaded are barred by principles of res judicata. To determine what issues were disposed of, we must look at the pleadings before the Commission and the three-Judge Statutory Court, the arguments made at those times by the parties, and the decisions then rendered. National Foundry & Pipe Works v. Oconto Water Supply, 183 U.S. 216, 234, 22 S.Ct. 111, 46 L.Ed. 157.

*Before the Commission:*

Ahnapee & W. Ry. Co. v. Akron B. B. R. Co., 300 ICC 736 (March 7, 1957), 302 ICC 265 (November 12, 1957) (Docket No. 31824 consolidated in Docket No. 31774).

In a complaint Docket No. 31824 filed by defendants and Susquehanna & Western Railroad Co. on July 7, 1955, against all plaintiffs, the Commission was requested to find that "the terms and conditions under which [Agreement No. 7] was approved are not in conformity with standards set forth in paragraph (2) of Section 5a [of the Interstate Commerce Act (the Bulwinkle Act)]. The Commission is further requested to prescribe such terms and conditions as will insure conformity of said Agreement, and its terms and conditions, with the aforesaid standards, or, in the alternative, to terminate its approval of such agreement."

The complaint went on to allege that defendants are traffic-terminating roads who, because of Car Service Rule 1, cannot usefully own a large car fleet; that since 1947, in order to benefit financially

the railroads owning the majority of the cars have, through their voting control, determined upon successive rate increases without regard to actual costs by giving colorable support for their calculations from statistical material which does not reflect costs, but which contains varied factors in the formula; that these large roads have agreed not to exercise the right of independent action by refusing to negotiate for any different rates with any other carrier; that defendants Boston & Maine and New York, New Haven and Hartford have endeavored to negotiate for rates which are reasonable and lawful and have been met with a concerted refusal, and concerted demands backed by litigation and threats of litigation to enforce payment of the rates so fixed, and by other means of pressure and coercion; and that such conduct renders the right of independent action ostensibly provided by Article XII of Agreement No. 7 a mere recital and so wholly without substance as to destroy the basis of the Commission's findings that Agreement No. 7 conformed to the requirements of Section 5a(6) of the Interstate Commerce Act.

It was prayed:

"1. That the Commission find that control of car rental rates and rules and regulations incident thereto by but a very small number of railroads is contrary to the standards set forth in Section 5a, and not in furtherance of the national transportation policy.

"2. That the Commission find that terms and conditions should be imposed to require that control of car rental rates and rules be taken from the hands of the General Committee as now constituted, and placed within a group or committee chosen by and representative of all railroads, large and small, situated throughout the country.

"3. That the Commission: (a) require the modification of the Agreement so as to provide for recognition of car-using and car-owning railroads in the approval of car rental rates and rules, or (b) withdraw its approval of the Agreement."

At the hearing before the Commission held in October, 1955, it was testified that 12 of the traffic-originating roads owning the largest number of cars, were in a position to control the subscriber vote and were able to effect the increases. There was testimony also that these roads had discriminated and used economic duress and applied coercive action against the complainant Susquehanna when it refused to abide by the established per diem rate, by rerouting traffic and withholding freights from it. It was shown, too, that suits had been brought against that railroad (the Susquehanna) in an attempt to collect these rates and that in those suits the Susquehanna had denied liability and counterclaimed alleging violation of antitrust laws.

Briefs filed by the complainants before the Commission reiterated the allegations of the complaint, and with respect to the right of independent action pointed out that although the Susquehanna, unlike the other complainants, was not a subscriber to Agreement No. 7, nonetheless it had a right of independent action as a result of the antitrust laws.

"Accordingly, the legal positions of the Susquehanna in taking independent action and that of subscribers to Agreement No. 7 in doing likewise are not different excepting only that the concerted denial of or interference with the Susquehanna's right of independent action would give it a cause of action under the antitrust laws while like denial of the right to subscribers to Agreement No. 7 would give them causes of action both under the antitrust laws and under Section 5a of the Interstate Commerce Act. The Susquehanna's standing to complain under Section 5a of the Interstate Commerce Act is that as a carrier it has an interest in and a standing to complain of conduct of other car-

riers the effect of which on the Susquehanna may run contrary to the National Transportation Policy."

In their exceptions to the report proposed by the Examiners recommending discontinuance of the proceedings and modification of Agreement No. 7 to provide for a representative of the Short Line Railroad Association, complainants asserted that "the power in the combination of credit lines to control the per diem rate which the trial examiner has specifically found to exist, and the demonstrated successful exercise of that power is, standing by itself, contrary to the antitrust laws." The Examiners were said to have in effect taken the position that, "granted that such a rate-fixing combination may exist and might otherwise be legally repugnant, it is not subject to attack because the result of its activities can be legalized or modified by the Commission." Complainants argued that such an analysis "runs counter to the principle laid down by the Supreme Court in Georgia v. Pennsylvania R. Co., 324 U.S. 439 [65 S.Ct. 716, 89 L.Ed. 1051] (1945).

"It is submitted that Section 5a does not legalize rate fixing combinations unqualifiedly and does not carve out a complete exception to the antitrust laws or establish an area in which none of the principles underlying the antitrust laws shall apply * * *. If the agreement or combination * * * created an understanding among its members or suffers the existence of a system, which in practical effect fails to enable the existence and conduct of relationships between members of the combination and non-members free and unrestrained by the existence of the combination, then the agreement fails to comply with the requirement of Section 5a(6). The result then is a violation not of Section 5a of the Interstate Commerce Act, but a violation of the Section 1 of the Sherman Act unexcused by any immunity under Section 5a of the Interstate Commerce Act."

The report of Division 2 of the Commission filed March 7, 1957 (300 ICC 73), observed that under paragraph 9 of Section 5a parties to any agreement approved by the Commission were relieved "from the operation of the antitrust laws with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission." Antitrust laws being defined under the ICA as laws against unlawful restraints and monopolies, the Commission considered complainants' contentions and, after carefully reviewing the procedures of Agreement No. 7, concluded (1) that there was no evidence that either the agreement was defective or that the parties' actions under it were "arbitrary, irresponsible, or improper"; (2) that the right of independent action under the agreement and under the Act meant only that "no subscriber to the agreement was contractually bound by any of the procedures issued pursuant thereto should it elect to take contrary action." It also concluded that exercising the right not to accept the result arrived at under the agreement, however, did not destroy the bilateral nature of the relation between car owner and car user, that once a carrier had exercised its right of independent action, the carrier's obligation to the owner carrier must be decided through means other than the agreement itself; namely, under the law through recourse to the Commission or the Courts, or both, and that "the existence of a right in the car user to deny contractual liability for the charge determined under the agreement necessarily implies an equal right on the part of the car owner to insist upon the charge as compensation which must be paid for the use of its property." (83–84); (3) that both complainants and defendants had exercised their respective rights and that the evidence was convincing that complainants had not been deprived of their right to take independent action and that nothing in the record was persuasive that the present voting arrangements were unlawful (with a minor exception

which it ordered corrected); and (4) that the complaint had to be dismissed.

On a petition for rehearing filed by all the complainants and the Department of Justice, it was again argued that the decision of the Commission restricting the right of independent action to withdrawal from the agreement had the effect of holding that approval under Section 5a authorized parties "without liability under the Sherman Act" to concertedly fix prices and refuse to deal outside the agreement; and that the proof before the Commission was that the plaintiffs had acted in the manner condemned by the Supreme Court in the antitrust suit, Georgia v. Pennsylvania, supra.

On November 12, 1957, the full Commission affirmed the Examiner's report and adopted all its findings (302–ICC 265). However, it made quite clear that if a repetition of the coercive acts charged by the Susquehanna, which it found were measures intended to interfere with the right of independent action, were brought to its attention, the Commission would withdraw its approval of the agreement.

While the complaint before the Commission did not in so many words charge a violation of the antitrust laws, whether the activities charged against plaintiffs, if found to exist, constituted a violation of these laws, was very much before the Commission in the hearings, in the briefs submitted by the complainants and in the arguments made and cases cited—particularly Georgia v. Pennsylvania, supra.

The activities complained of before the Commission and here in all the paragraphs of the Affirmative Defense and Counterclaim, with the exception of those set forth in paragraphs 60 and 67–70, are practically a carbon copy of each other; a claimed abuse of the procedures under the Agreement and a deprivation of the right of independent action which there should have impelled the Commission to withdraw its approval of Agreement No. 7 as in violation of Section 5a and which here should impel this Court to withhold enforcement of any per diem rates as in violation of Section 5a as well as of the Sherman Act.

Whether these activities took place in fact, and whether they had the effect complained of, and whether they were in violation of the statutory policy of the ICA was the principal issue, litigated and controverted. It was upon a finding of their non-existence, and that the agreement was in conformity with Section 5a and that plaintiffs had done nothing illegal, that the final determination was reached. Cromwell v. County of Sac, 1876, 94 U.S. 351, 24 L.Ed. 195.

■ Obviously, the Commission did not make a specific conclusion of law that plaintiffs were not in violation of the antitrust laws; it was not called upon to do so; and such a conclusion, even if within its power to make, would not be binding on a Court in which the issue was raised. (Cf. 28 U.S.C. § 1337.)

■ But the Commission does have jurisdiction to make factual findings on a matter peculiarly within its province— its specialized knowledge and experience—that plaintiffs were not engaging in activities which now in a different proceeding or suit are claimed to constitute a violation of the antitrust laws. Federal Trade Commission v. Cement Institute, 1948, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009. Not only are such factual findings an adjudication which we would be bound to accept as a basis from which to draw legal consequences (Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; United States Navigation v. Cunard SS, 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408); but in addition they are findings which by reason of statutory grant (Section 5a (9)) serve to clothe the parties and their actions under an agreement approved, with immunity from prosecution under the antitrust laws.

■ It has been stipulated that the actions of the plaintiffs—nefarious as they seem to defendants—in establishing the rates in issue were in conformity with the approved agreement. The present suit is no different from that filed against

the Susquehanna—to collect the per diem rates established under the agreement. It was found by the Commission that plaintiffs' actions in attempting to enforce the rates by litigation or threats of it were also in conformity with the provision of the agreement. We accept that finding as to the meaning of the right of independent action as barring the defense now urged—Defendants' paragraph 56—that the present suit is in violation of that provision of the agreement and in pursuance of a conspiracy under the antitrust laws.

No appeal was taken by the parties from the Commission's determination of 1957 and no further petition was filed to reform the agreement or have the Commission withdraw its approval. There is a right to appeal and no time limit. The Commission in its decision reported in 302 ICC 265 also expressly noted the right of any party to move to reopen the proceedings upon a complaint of coercion and duress.

The decision is, however, for our present purposes final, not only because the finding of the Commission is on the merits as a factual determination of specific acts peculiarly within its expertise and unlikely to be disturbed by any Court, but because the possibility of subsequent withdrawal of its approval in the event of a further proceeding would hardly be retroactive as to render unlawful conduct of plaintiffs which, having been approved, was pursued in reliance on a lawful statutory immunity. Withdrawal of immunization, any more than conferral of approval, cannot have a retroactive effect. Cromwell v. County of Sac, supra; Bluefields S. S. Co. v. United Fruit, 3 Cir., 243 F. 1; Restatement of Judgments, Sec. 41; Seatrain Lines v. Pennsylvania R. Co., supra.

There is no reason why the Commission's decision should not have the status of a judgment so as to come within the doctrine of collateral estoppel by judgment. "There was a contested proceeding before the Commission, with decision depending upon the present issue and the present parties taking opposite sides on

it. Res judicata should and does apply." Seatrain Lines v. Pennsylvania R. Co., supra, 207 F.2d at page 259; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; 2 Davis, Adm. Law, Sec. 18.02. Certainly, this is in furtherance of the doctrine "established as a procedure for carrying out the public policy of avoiding repetitious litigation." Partmar Corp. v. Paramount Pic., 347 U.S. 89, 91, 74 S.Ct. 414, 416, 98 L.Ed. 532.

We conclude, therefore, that the matters (with one exception) now raised by the Fourth Affirmative Defense and Third Counterclaim have been determined adversely to defendants by the Commission's proceedings in Ahnapee, where they were actually pleaded, argued and determined and that, because of the Commission's determination, the parties are collaterally estopped from again litigating them. Lawlor v. National Screen Service, 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122.

*The Statutory Court Suit:*

Boston & Maine v. United States, D.C. D.Mass.1958, 162 F.Supp. 289; 1958, 358 U.S. 68, 79 S.Ct. 107, 3 L.Ed.2d 34.

On September 18, 1953, 19 railroads and 15 additional railroads intervening in support (33 of which were intervening defendants in the statutory court action and 31 of which are plaintiffs here) filed a complaint before the Commission under paragraphs 4, 10 and 11 of Section 1 of the Interstate Commerce Act. These statutory provisions require carriers to provide car service and to establish reasonable rules and regulations including reasonable compensation. It was claimed that the defendants were using their cars and were paying less than reasonable rates in violation of the Act. They sought an order from the Commission declaring that the per diem rates of $1.75, $2 and $2.40, which had been determined pursuant to Agreement No. 7, were "just, reasonable and otherwise lawful" and further declaring that the performance of orderly transportation service by railroad in the public interest re-

quired uniform observance of such rates by defendants.

The jurisdiction of the Commission was based on Section 5(d) of the A.P.A. (5 U.S.C.A. § 1004(d)), giving government agencies power to issue declaratory orders to terminate a controversy; and on Section 1, paragraph 14(a) of the Interstate Commerce Act. This provision authorizes the Commission, after hearing on a complaint or upon its own initiative, to establish reasonable rules, regulations and practices with respect to car service including the compensation to be paid by one carrier to another for the use of its car.

The answers of the defendants questioned the reasonableness of the rates and prayed for dismissal of the complaint on the ground that they had withdrawn from the Agreement. The joint brief of two defendants attacked the jurisdiction of the Commission to fix past rates alleging that to so authorize it would be an unlawful grant of judicial power to award damages in a contract suit, and urging that the only power the Commission had was rule making power, limited to fixing future compensation. In their answer, however, defendants New York, New Haven and Hartford and Boston & Maine, and other short-line defendants, asked that the Commission find the present rates unreasonable and that it establish a maximum rate or a graduated scale.

The proposed report of the Examiner approved the reasonableness of the rates; in their exceptions, generally the defendants requested that a formula be fixed. The defendant New York, New Haven and Hartford also filed exceptions objecting to the Commission's jurisdiction to issue a declaratory order, urging that Section 5(d) of the A.P.A. is limited to cases which are "required by statute to be determined on the record after opportunity for an agency hearing". It was urged that the violation charged in the complaint required no hearing by the Commission and that while it had jurisdiction to make rules under Section 1(14) (a), complainants had not sought rules but an adjudication. After hearings, the Commission issued its report finding that "a controversy existed and that a declaratory order would be appropriate." On the basis of Section 1(14) (a), it found that the rates were not in excess of reasonable compensation and that lower rates would not be compensatory. (Chicago, B. & Q. R. Co. v. N. Y., S. & W. R. Co., 297 ICC 291.) A petition for rehearing was denied on July 16, 1956.

At no time was the question of antitrust violation raised before the Commission; the only attack was to the jurisdiction of the Commission under the ICA.

On November 29, 1956, some of the defendant roads in the Commission proceedings, including the two defendants here, filed a complaint in the United States District Court, for the District of Massachusetts, against the United States of America and the Commission, seeking an order annulling and setting aside the report and the orders of the Commission based thereon (28 U.S.C. § 1336). A number of the car owning roads which had been plaintiffs before the Commission, including some of the present plaintiffs, intervened in support of the Commission in that action. This complaint attacked the Commission's jurisdiction to establish the rates for the past under Section 5(d) of the A.P.A. or Section 1(14) (a) and, in addition, urged that its findings of reasonableness were not supported by evidence. Factually, it set forth the same acts on the part of plaintiffs as were before the Commission in Ahnapee and as are now alleged in the Fourth Affirmative Defense and Third Counterclaim; that the conspirators were the large traffic-originating roads who were since 1947 using Car Service Rule 1 and the voting procedures of Agreement No. 7 to systematically increase the per diem rates; that they based these increases on varying formulas to give colorable support to their calculations, etc. and refused to revise these formulas although defendants have sought to do so. Attacking the Commission's jurisdiction, they urged that the

Commission's order had been excepted to by them because it was in contravention of Section 5a(6) of the Interstate Commerce Act "and of Section 1 of the Sherman Act in that it would impose on them the results of a price fixing agreement prohibited by Section 5a(6) of the Interstate Commerce Act and Section 1 of the Sherman Act". They contended that the Commission, in sustaining the lawfulness of the rates, had nullified the right of independent action which was required by Section 5a of the Interstate Commerce Act and enabled the exercise by the combination of a "monopoly power in restraint of commerce prohibited by the Sherman Act"; that it erred in failing to dismiss a complaint where it was evident that there existed a "combination, understanding and concert of action * * in violation of the antitrust laws" and that the relief sought from the Commission "would further the objective of said combination, understanding and concert of action."

The District Court upheld the jurisdiction of the Commission to entertain the plaintiff's complaint for a declaratory judgment. The Court, however, ruled that it should have further investigated the method for calculating compensations and remanded the matter for further evidence. With respect to the antitrust charges, it wrote:

"We are not impressed with the argument advanced by some of the plaintiffs that the Commission should have dismissed the complaint for a declaratory judgment filed with it by the trunk line roads on the ground that in bringing it the complainants were acting in furtherance of a conspiracy unlawful under the Sherman Anti-Trust Act. Indeed, we are so little impressed with the argument that we see no need either to specifically refute it or even to state it in detail." (162 F.Supp. at page 298) [7]

It is clear that while the defendants raised the antitrust question in their pleadings and their briefs, based on the same conduct as is here alleged, the District Court's opinion was concerned with the Commission's jurisdiction to establish the rates. It never considered the question of antitrust violation; whatever comfort may be derived by plaintiffs from the judicial dictum as to the Court's opinion of the merits of this defense, and by defendants from the fact that its evaluation of it is dictum—it is clearly neither collateral estoppel nor res judicata.

The decision of the Supreme Court in dismissing both appeals filed, was limited solely to the question of the Commission's jurisdiction, which it found "prematurely presented for decision" without prejudice to its being raised again "if it survives the Commission's proceedings"—in view of the Commission's readiness to proceed in accordance with the terms of the remand of the District Court. Not a word was said of antitrust violation, and this failure to even mention seems to be wholly without significance.

We conclude that in neither the District Court opinion nor in that of the Supreme Court was there a final decision on the merits holding that Agreement No. 7 or the acts of the plaintiffs were not in violation of the Sherman or Clayton Acts.

---

**7.** The United States had pointed out that defendants (plaintiffs there) were seeking to raise for a second time the conspiracy issue which they had unsuccessfully advanced in the Ahnapee proceeding. In oral argument before the three-Judge Court on December 2, 1957, Mr. James H. Durkin of the Antitrust Division of the Department of Justice stated: "Further, with respect to the antitrust violations, those issues were litigated before the Commission in an Agreement No. 7 proceeding decided just last week or decided a week before and served on the parties last week. We examined the record very carefully in this proceeding to see if there was any independent concerted actions other than those approved by the Commission in the proceeding which did infringe upon the rights of plaintiff here. We found none. Nowhere in the plaintiffs' briefs did they contend that there were any concerted actions other than those established in their Agreement No. 7 itself." (Record, p. 114 et seq.)

There remains for determination then the allegation in paragraph 64 that the plaintiffs have been propagandizing the Commission to secure a determination from it which would make the present rates binding on defendants and the charges of the counterclaim in paragraph 68 that plaintiffs are employing duress and coercion and withholding tariffs.

Since these allegations were not before the Commission, we will consider their legal sufficiency as well as that of the entire Fourth Affirmative Defense and Third Counterclaim—the other basis for plaintiffs' motion to dismiss.

As early as 1902 in Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 and as late as 1959, Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 431, 3 L.Ed.2d 475, it has been declared that "as a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court."

This has been because of the overriding policy first enunciated by Justice Holmes in his dissent in Continental Wall Paper Co. v. Voight & Sons Co., 1907, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486, that "people [should be prevented] from getting other people's property for nothing when they purport to be buying it." 212 U.S. at page 271, 29 S.Ct. at page 296. See also Wilder Mfg. Co. v. Corn Products, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520; Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219; Kelly v. Kosuga, supra, cited in the most recent case Tampa Electric Co. v. Nashiville Co., 1961, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580, where the Court found it unnecessary to pass upon the sufficiency of the antitrust defense because it dismissed it on the merits.

Besides, Agreement No. 7—assuming its illegality as a price fixing agreement—was an agreement entered into pursuant to legislative edict—The Esch Car Service Act, supra—and immunized further by legislative edict—the Bulwinkle Act; and its enforcement would not be precluded by reason of the antitrust laws for "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out" (Eastern R. President Conference v. Noerr Motor Freight, supra, 365 U.S. at page 136, 81 S.Ct. at page 529).

Finally, neither the filing of suit nor the propagandizing of the Commission in furtherance of plaintiffs' joint effort to impose these rates is in violation of the Sherman Act. Eastern R. President Conference v. Noerr Motor Freight, supra. Whether plaintiffs have been withholding tariffs in an attempt to enforce the rate is a question which can be raised and determined in the Commission proceedings and with which the Commission is particularly concerned and better able to dispose of.

What we have said with respect to the Fourth Affirmative Defense applies with equal force to the Third Counterclaim which rests on the same allegations. See Connolly v. Union Sewer Pipe Co., supra. In addition, to the extent that the treble damage claim filed under the Clayton Act is based on activities prior to 1955, it would seem barred by the four-year limitation of Section 15b, 15 U.S.C.A.

On March 24, 1959, the Commission set the reopening of the proceedings for further hearing pursuant to the remand of the District Court and on July 24, 1959, initiated a rule making proceeding under Section 1(14) (a) of this Act, which it consolidated with the reopened proceeding in ICC Docket No. 31358. These proceedings are now pending in the Consolidated ICC Docket Nos. 31358 and 33145.

We have denied defendants' motion to stay these suits pending the Commission's determination because the issue presented to us is whether there was a binding contract between the parties—this is a determination which lies within our special competence and conventional experience as contrasted with the amount of compensation recoverable which involves a determination within the special competence of the agency created by Con-

gress for regulating this very subject matter and better equipped by insight gained through experience. Far East Conference v. United States, 1952, 342 U.S. 570, 575, 72 S.Ct. 492, 96 L.Ed. 576; Southwestern Sugar & Molasses Co. v. River Terminals, 1959, 360 U.S. 411, 420, 79 S.Ct. 1210, 3 L.Ed.2d 1334.

The question was ripe and since its adjudication in no way impinges on the Commission proceedings, there is no good reason to stay our decision while these completely separate proceedings—which certainly appear to be assuming substantial dimensions—are pending. Southwestern Sugar & Molasses Co. v. River Terminals, supra.

Whether the Commission is finally found to have jurisdiction to establish the amount of compensation recoverable or whether it is not, a judgment will have to be entered in this Court either based on the Commission's determination or on the Court's on a quantum meruit basis. But because entry of judgment in any amount at this time requires the resolution of issues which Congress has placed within the special competence of the Commission, our judicial process to this extent will be suspended. United States v. Western Pacific R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126.

In conclusion:

(1) we deny defendants' motion for a stay of these suits;

(2) we grant plaintiffs' motions to strike defendants' Fourth Affirmative Defense and Third Counterclaim;

(3) we direct entry of interlocutory summary judgment in favor of the 21 plaintiffs (who had no contract not to sue) to the extent only of declaring and adjudging that these plaintiffs are entitled to recover from defendants per diem rates in such amounts as are to be ultimately determined to be due them by this Court based upon a rate fixed by the Commission and the Court, or by the Court alone, for the period August 1953 to date with interest;

(4) with respect to the 88 plaintiffs who had agreed not to file these suits, while they would be entitled to judgment in their favor along with the other 21 plaintiffs, the entry of judgment in their favor will be stayed in toto pending final determination by the Commission of the rate controversy in Docket No. 31358 presently pending;

(5) the parties are directed to settle an interlocutory judgment to this effect. And because of the important controlling question of law presented by these suits, they are further directed to settle an order before me containing the provisions of Section 1292(b), Title 28 United States Code.